THERESA S. LAWRENCE *v.* JOHN W. STEWART.

January Term, 1938.

Present: POWERS, C. J., SLACK, MOULTON and SHERBURNE, JJ.

Opinion filed February 4, 1938.

334

*Novak & Bloomer* for the plaintiff.

*Finn & Monti* for the defendant.

POWERS, C. J. This suit is brought to recover for the board and care of Bridget Stewart, the aged mother of the parties thereto. The complaint is the common counts in assumpsit. The answer is a general denial, and a special answer setting forth the establishment of the "fund" hereinafter described; admitting a contract with the plaintiff to keep and care for Bridget, the pay for which service was to come from the interest on said "fund," which contract was to continue for a period of three months, only; alleging the payment in full for that period; admitting that the plaintiff continued to keep and care for Bridget after the expiration of said period, but asserting that this was without any contract between the parties; alleging that during the continuance of said service, he paid the plaintiff various sums on account thereof voluntarily and without obligation; alleging that on June 22, 1934, he notified the plaintiff that he had arranged with their brother, Patrick, to support and care for Bridget, and that he would no longer be responsible therefor to the plaintiff; and averring that there remained in the "fund," after deducting the $650 hereinafter described, and other sums that he had paid out for his mother, the sum of $960.79, as of August 3, 1936.

This special answer was met by a general denial. The trial below was by jury, and at the close of the evidence, a verdict was ordered for the defendant. The plaintiff excepted.

Two questions stand for our determination:

> 1. Did the evidence, construed in the light most favorable to the plaintiff, fairly and reasonably tend to establish facts sufficient to warrant a recovery?
>
> 2. Does the provision of the Statute of Frauds relating to contracts not to be performed within

one year preclude a recovery on the contract here involved, which contract was not in writing?

The evidence was sharply conflicting, and that of each of the parties was more or less uncertain and contradictory. But construed as above, it would justify a jury in finding the facts hereinafter recited.

Sometime in the year 1932, Bridget met with an accident which left her with a broken leg. The defendant arranged with his sister, Winnie, to take care of their mother. And though this contract called for a payment of only $15 per week, the defendant actually paid Winnie $20 per week for her services. This money all came out of his own pocket. The plaintiff knew about this, for the defendant wrote her all about it in his letter of August 4, 1933, which was before the plaintiff began to keep and care for Bridget under the contract here sued upon.

Just prior to July 31, 1933, Bridget had been making her home with her son, Patrick, in Mt. Holly, and was being cared for without charge. Patrick's wife, Anna, was worn with the strain, and asked to be relieved for a time. On the date last mentioned, the plaintiff wrote the defendant offering to take and care for their mother if he would pay her $10 per week. To this letter the defendant replied, expressing satisfaction with the price named, and informing the plaintiff that there was then due $65 of interest on the "fund," and that he would pay the next installment of interest, $65, in advance; that she could have this, which would cover 13 weeks at $10 per week; and that at the end of that time, perhaps Anna would take Bridget back. There was no direct and express promise in this letter to pay, either from the defendant's own money or from the interest on the "fund"; but the plaintiff was fully justified in understanding that she was to receive from the defendant for the care of Bridget, $10 per week for at least 13 weeks. Thereupon, on August 7, 1933, the plaintiff, with her brothers, James and William, went to Mt. Holly, and brought Bridget to the plaintiff's house in Cuttingsville, where she has since received adequate and satisfactory care at the hands of the plaintiff. At that time, Bridget was 83 years of age, nearly if not totally blind, much enfeebled in body, and mentally incompetent even to give her consent to the use of her own money for her own care.

The plaintiff kept and cared for her, charging $10 per week, for 56 weeks, for which service she has been paid by the defendant $545.

The 13 weeks spoken of in the defendant's letter referred to above expired November 6, 1933. For this period, the defendant paid the plaintiff $130 as follows: On August 14, 1933, $35; on September 6, 1933, $30; on November 1, 1933, $30; on December 18, 1933, $35. These payments were made by the defendant's personal checks drawn on a Barre bank. With each of them, the defendant enclosed a receipt for the plaintiff to sign and return. These receipts were made on printed blanks filled out by the defendant, and in his handwriting they recited that they were "for board and care of Bridget Stewart." The plaintiff signed them and sent them back to the defendant. At the expiration of the 13 weeks period, no change was made in the arrangement or in the relations of the parties. Bridget remained at the plaintiff's as before, and the plaintiff boarded and cared for her as before. Nothing was said or done to terminate or change the contract for the plaintiff's services. But the defendant paid the plaintiff thereafter $240 as follows: January 18, 1934, $40; February 14, 1934, $40; March 16, 1934, $40; April 17, 1934, $40; May 16, 1934, $40; June 18, 1934, $40. These payments were all made by the defendant's personal checks drawn on the Barre bank, and were receipted for by the plaintiff by receipts filled out by the defendant containing the statement, in his handwriting, "for board and care of Bridget Stewart." It is quite obvious that the checks were intended to cover the price of $10 per week, or $40 per month.

█ █ This course of dealing carries a strong implication that both parties understood that the original contract was, by tacit consent, continued in force. This inference was disputable, of course, and left a question for the proper consideration of the jury. But by the plainest principles of fair dealing, the plaintiff was entitled to notice of the change of relations between herself and her brother and to be relieved of the burden of her mother's care, before her pay could be cut off. She had a right to presume that her contract with the defendant continued on the same terms as before, and a jury would be amply justified in finding that fact from the course of dealing, alone. Williston, Contracts (rev. ed.), § 390; *Jones* v. *Moore,* 50 Vt. 53, 57; *Home*

*Fire Ins. Co.* v. *Barber,* 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 A. S. R. 716, 743; *Sines* v. *Wayne County Supts.,* 58 Mich. 503, 25 N. W. 485, 487.

After Bridget came to the plaintiff's in August, 1933, she failed gradually but steadily in both mind and body, and finally, as early as September, 1934, became a complete wreck, mentally and physically. The labor of caring for her increased constantly. The nature and particulars of the care and attention her situation demanded need not here be recounted. It is enough to say that the plaintiff's labors and duties were enormously increased until, as she stated it, hers was a 24-hour-a-day job, worth $30 a week, and as the defendant put it, a 20-hour-a-day job worth $25 per week. The time came when, as she said, the burden became too heavy for her to bear alone. On January 13, 1934, she wrote a letter to the defendant in which she referred to the matter of getting some one to help her; and she said that her brother, Jim, thought that the defendant "should make it [her pay] enough so I could afford to have some one to help me at this time." The defendant replied to this letter on January 18, 1934. He did not mention the subject of larger pay, but called attention to the fact that he had paid out for his mother a large sum which came out of his own pocket, and enclosed a check for $40, which he said also came out of his pocket. This was the $40 last above referred to.

In a letter dated June 18, 1934, the defendant wrote the plaintiff that he had arranged with Patrick to take Bridget and care for her. The plaintiff replied, vigorously objecting to this plan and insisting that she was going to keep her mother, and "look for pay" as long as she lived. This letter was dated June 25, 1934.

This seems to be where the plan to move Bridget ended. The defendant did not insist upon it. Nor did he then or ever inform the plaintiff "that he would no longer pay for the care and support of said Bridget Stewart" out of said "fund" or otherwise. The allegation in the special answer to that effect is wholly unjustified.

On December 1, 1934, the defendant sent the plaintiff a check for $25 in a letter in which he said that he thought she ought to have some help and that he hoped she could use the check for that purpose. Not a word did he say about moving his mother

to Patrick's. Nor did he then find any fault because the plaintiff kept her. Not only that, but it seems plain that he desired and expected that Bridget should remain at the plaintiff's, because he had looked up and found certain bedding and bedclothes which the plaintiff had called for and sent them to her. Then, too, on January 5, 1935, February 7, 1935, March 12, 1935, April 16, 1935, May 13, 1935, and June 21, 1935, the defendant sent checks for $25 each to the plaintiff. On the back of these checks, as well as those hereinbefore referred to, in the defendant's handwriting was endorsed "Acct. Mrs. B. Stewart." It does not appear that these checks were receipted for, but they were all for payments on the board and care of Bridget Stewart, and so understood by both parties.

All of these payments were made after the talk of Bridget's going to Patrick's was had, and show that the defendant then considered that Bridget was under the plaintiff's care and that the plan to take her away had been abandoned.

Moreover, the defendant testified that in September, 1933, he either wrote or said to the plaintiff that he was glad that Bridget was with her, and that he hoped she would "spend her days" with her; and that he had assured the plaintiff that she was to be paid for her services, and that he wanted her to understand that her pay was to be what was fair and reasonable. A jury would be warranted in concluding that both parties wanted the arrangement to be permanent and the pay to be commensurate with the labor involved.

Throughout the trial below, the defendant claimed that there could be no recovery in this suit, unless the plaintiff established an express contract. The reason assigned was that the specification so restricted the plaintiff. But there is nothing in the specification that limits the plaintiff's proof to a special or express contract. Its terms are as applicable to an implied as to an express contract. The complaint being the common counts, and no question of pleading being raised, the plaintiff can recover on proof of either an express or implied contract.

The evidence, together with the solemn admission of the defendant's special answer, unquestionably shows an express contract for a limited time, at least. And there was evidence tending to establish an implied contract warranting a *quantum meruit* recovery. Just how far that will carry the plaintiff on a retrial,

we are not now called upon to decide. It will be for the jury, properly instructed, to say what the extended contract really was, and how much, if anything, is due on it.

The "fund" is not a fund at all. It is only a sum of money represented by a promissory note which came into existence in this way: Bridget Stewart had some money on deposit in a Rutland bank. One or both of her daughters had been getting some of this money for their own use. On August 3, 1931, this deposit amounted to $2,100. On that day, the defendant and Bridget went to the bank and she drew out the money and passed it over to the defendant, and he gave her his six percent promissory note for it. He used the money in his own business, and does not deny liability on the note. He claims, and gave evidence tending to show, that it was the agreement between him and his mother that he was to handle the money for her benefit according to his best judgment, reserving enough to bury her. At some time prior to this transaction, Bridget made the claim that the defendant owed her the sum of $650. The defendant disputed this, but on September 10, 1929, he gave his mother a check for $650 on account of her claim. He testified that after he received the money from the bank and gave her his note, his mother told him that he never owed her the $650, and asked him to deduct it from the note. He never made an endorsement of the $650 on the note, which had been given into his custody by his mother, but he testified that he made the deduction on January 3, 1932. Yet, more than a year and a half after that date, in his letter to the plaintiff dated August 3, 1933, the defendant wrote calling attention to this arrangement with his mother, and saying, "Mother's funds which she loaned me are still intact." He also said in this letter that the interest on the "fund" was $130; that he would like to reserve about $500 for burial expenses; and that "that would leave around $1,600 which could be used"—for Bridget's care. He made no reference to the $650. It is apparent that if he had deducted that sum from the note a year and a half before, the interest would be less than $100, and the amount available for Bridget's care would be less than $1,000. The defendant testified that until this suit was brought (May 28, 1936), he was claiming that the "fund" was intact; and that after that time, he started making the claim that it was not intact.

In these circumstances, a jury would be justified in concluding that Bridget did not retract her claim to the $650, and that it was not deductible from the "fund." The importance of this lies in the fact that a jury might decide that the plaintiff was entitled to her pay only so far as the "fund" would provide the money for it. In that case, the amount of the "fund" and the question whether the defendant could deduct the $650 from it would be important.

The defendant repeatedly said in his testimony that the plaintiff ought to have her pay "if there was enough in the fund," and that $25 per week would be a fair price for her services from September, 1934, when Bridget became bedridden. Though he was insisting in his letters to the plaintiff that he could not and would not use any of the principal of the "fund" for Bridget's care, it seems quite apparent that the defendant could not expect the plaintiff or any one else to undertake that burden for the amount of the interest on the "fund." Both parties must have understood that the major part of the money already paid to the plaintiff must have come from the defendant's pocket and that the major part of the money subsequently accruing to the plaintiff would have to come from the same source or some other supply outside of the interest on the "fund." That interest, assuming that the "fund" was intact, amounted to only $2.50 per week. So when the rate of pay was $10 per week, it would require $7.50 per week to be made up somehow. That the defendant expected to make up the amount due to the plaintiff from his private resources is indicated, not only by his conduct, but by his letter to her of June 18, 1934, in which he sent her a check for $40, as stated; for he said therein that he could send her no more money for several months. This statement must have referred to money from his private funds, because he gave as a reason for his inability that he had interest, insurance and taxes due in July, August and September—all obligations calling on his private funds.

The case was for the jury on the question of liability, and the first question above specified must be answered in the affirmative.

The Statute of Frauds has nothing to do with the case. The contract here involved was the personal contract of the plaintiff. It was to be performed by her, alone. It could not

become binding upon her representative or any other person. It continued only through the lifetime of Bridget Stewart, and terminated at her death. Unless sooner ended in some legal way, it was fully performed at that time. Upon the same hypothesis, it would be fully performed on the plaintiff's death. So this contract *might* be fully performed within one year from the time it was entered into. To such a contract, the Statute of Frauds does not apply. 1 Williston, Contracts, § 495; *Sherman* v. *Champlain Transportation Co.*, 31 Vt. 162, 182; *Blanchard* v. *Weeks*, 34 Vt. 589, 591; *Dyer* v. *Lalor*, 94 Vt. 103, 118, 109 Atl. 30; *Warner* v. *Texas & Pac. Ry. Co.*, 164 U. S. 418, 41 L. ed. 495, 17 Sup. Ct. 147. The second question above stated must be answered in the negative.

*Judgment reversed and cause remanded.*