**Howard B. KECK, Plaintiff,**

v.

**Charles H. WACKER, III, et al., Defendants.**

**Civ. A. No. 74–49.**

United States District Court, E. D. Kentucky, Lexington Division.

June 3, 1976.

Miller, Griffin & Marks, Lexington, Ky., for plaintiff.

Riordan, Malone & Kelly, Chicago, Ill., William B. Gess, Lexington, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SILER, District Judge.

After a trial before the Court without a jury on February 17, 1976, the Court has considered the evidence presented and the briefs and proposed findings of fact and conclusions of law from all parties, and makes the following findings of fact and

conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Plaintiff, Howard B. Keck (hereinafter called "Keck") a citizen and resident of Texas, brought this suit against the defendants, Charles H. Wacker, III (hereinafter called "Wacker"), and his mother, Mrs. Frederick G. Wacker (hereinafter called "Mrs. Wacker"), both citizens and residents of Illinois; and the defendants, Hirsch Bloodstock Agency and Mike Hirsch, d/b/a Hirsch Bloodstock Agency, citizens and residents of California. The amount in controversy is $117,000.00, exclusive of interest and costs which is the sales price of a thoroughbred mare, PLAGE, the subject of this law suit. The res (PLAGE) is in the Eastern District of Kentucky, and the cause of action arose from the transacting of business, that is, the sale and purchase of the mare, at the Keeneland Sales in Lexington, in the Eastern District of Kentucky, on January 15, 1974. The mare, PLAGE, was owned by Keck, but kept at Claiborne Farms, Inc. (hereinafter called "Claiborne Farm") near Lexington for him and was bred to the stallion FORLI in 1972, but did not produce a foal. In 1973, she was bred to another stallion, HERBAGER, and was sold while thus in foal at Keeneland in 1974. Horses which are to be sold at Keeneland, as is the practice in other locations, are listed in a printed catalogue, which includes, inter alia, their ancestry and produce record. PLAGE was listed in the catalogue as "Produce record: 1973 Barren." This information was provided for Keeneland by Claiborne Farm which acted as Keck's agent in selling the mare.

It is customary for buyers to rely entirely upon the catalogue data when purchasing a horse at these auctions. The purchaser was the defendant, Mrs. Wacker, through her son, the defendant, Wacker, who employed for her as agent, the defendant, Mike Hirsch, doing business as Hirsch Bloodstock Agency, to purchase the mare at the auction. Before authorizing Hirsch to bid for this mare, Wacker consulted with Hirsch and both read and relied upon the catalogue information about PLAGE, but neither consulted Keck or Claiborne Farm about the breeding records before the purchase of the mare. Hirsch did look at and examine the mare prior to the sale. Acting in this capacity, Hirsch was the successful bidder at $117,000.00[1] and the mare was delivered to Spendthrift Farm at Lexington for Mrs. Wacker shortly thereafter. Subsequently, the mare slipped (aborted) a dead foal on February 6, 1974, due to a virus infection, and not due to any mishandling after the sale.

Within a few days after the abortion, Wacker was notified of it. At about the same time, he was told by William Haggin Perry that the mare had slipped in 1972, contrary to the Produce Record listed in the sales catalogue. Wacker then called Claiborne Farm and spoke to a veterinarian, Col. Floyd C. Sager, who told him that the records of the farm indicated that mare had been declared in foal and then was declared barren, which meant "there had to have been an abortion or slip" if the records were correct for the mare in 1972–73.

Wacker then unsuccessfully attempted to call Keck and William Evans, Sales Director, Keeneland Association, the organization which conducts the sales. On February 11, 1974, Wacker wrote letters to both Keck and Evans, indicating the sale should be "null and void" since he thought the mare was misrepresented in the sales catalogue. He thus made a revocation of the sale within a reasonable time thereafter, since it was shortly after he discovered the error in the description, or the conformity, of the mare in the catalogue. Keck would not nullify the sale and demanded payment for the mare. Since the defendants refused to pay, Keck brought suit for a judgment on the sales price.

The controversy in the case concerns whether the mare was properly listed in the

---

1. He was actually authorized to bid up to $115,000.00, but Wacker ratified the purchase later, and no issue is made of the fact that he exceeded his authority.

catalogue as "barren" when it was sold.[2] All parties agree and the Court finds that "barren" means "bred and did not conceive" and "slipped" means "bred, conceived and then aborts the foal." The disagreement is the procedure in reporting and listing a mare which has been bred, declared to be in foal, but is subsequently examined by a veterinarian and declared "empty" (no fetus) with no evidence of a fetus being found. The plaintiff asserts such a mare is to be listed as "barren," whereas the defendants insist that such a mare is "slipped."

The Court finds that the mare PLAGE was in foal to FORLI on July 11, 1972, (forty-two days after breeding) when examined by Dr. Walter C. Kaufman, III, a veterinarian at Claiborne Farm. At that time, PLAGE had been bred to FORLI on April 13, May 1, and May 31, 1972. Although Dr. Kaufman examined the mare thirty days after the last breeding and concluded that PLAGE was not in foal, the examination at that time was not as reliable as the forty-two day examination. Subsequently, on October 11, 1972, PLAGE was again examined and found to be "empty" but no evidence of a fetus was found. That, however, did not mean that PLAGE was never in foal, for she may have slipped the foal in an early period of her pregnancy, and the fetus could have been eaten or carried off by birds or other predators, as it is rather small in the early stages of gestation.

Since the veterinarians, Drs. Kaufman, James Buell, and William R. McGee, testified that the forty-two day test is almost an absolute determination of being in foal, then it was not necessary to find evidence of an abortion in order to verify the finding of pregnancy at the forty-two day period. Sometimes, a mare is diagnosed as being in foal, whereas it was later found to have a cyst or similar growth, but if the cyst was found on the forty-two day examination, it follows that it would have been found later in October, since it does not disappear.

Clairborne Farm and the C. V. Whitney Farm, another large thoroughbred horse farm located near Lexington, followed the procedure of reporting or listing such mares as barren unless the fetus was found or there was other evidence of an abortion. To some degree, this was approved by Calvin Rainey, Executive Secretary of the Jockey Club in New York, which is the record-keeping authority in thoroughbred horse pedigrees. On the other hand, several other persons, including William Evans; Dr. Buell; Brian Sweeney, General Manager of the California Thoroughbred Breeders Association; Edward Barry Ryan, owner of Normandy Farm near Lexington; and John A. Bell, operator of a horse farm and bloodstock agency and former member of the Kentucky Racing Commission, all experienced in the thoroughbred horse industry, testified that such a mare should be listed as "slipped" rather than "barren." Therefore, using the definition of "usage of trade" as found in KRS 355.1–205(2), the Court finds that listing PLAGE as barren was not in accordance with a usage of trade in the thoroughbred horse industry. The Court also finds that the goods, that is, the horse, failed to conform to the contract description. The contract here obviously is the terms of the auction and the representations relied upon are those listed in the catalogue. Although the defendants could have contacted Claiborne Farms with regard to the history of PLAGE, they did not do so and were justified in relying upon a description of the mare in this sales catalogue.

The slip of the foal subsequent to the sale of the mare was not precipitated by anything related to the earlier slip; it was merely coincidental. Viral infections are maladies affecting horses and are common causes of abortion, even when the horse is treated by a nasal spray as a precautionary measure, as was done for PLAGE.

However, the mare's nonconformity to the description substantially impaired its

2. The listing is for its breeding record during the gestation period, which ran from May, 1972, to April, 1973. This mare slipped in 1972, but it should be listed in 1973 as slipped, since it was to have foaled in that year.

value to Mrs. Wacker and Wacker. The latter testified that if the catalogue listed the mare as "slipped" rather than "barren" it would have been worth about $40,000.00 instead of $117,000.00. Other witnesses corroborated that the mare would have sold for less money had she been listed as "slipped" in the catalogue.

There was, therefore, a material misrepresentation at the time of the sale of this mare from Keck to Mrs. Wacker, but that was innocent misrepresentation, not actionable fraud, because of the following:

1. Keck relied upon Claiborne Farm to list the mare in the sales catalogue in accordance with the practice in the industry.

2. Clairborne Farm relied upon an interpretation of the practice from the Jockey Club, which it had every right to do, and acted upon an honest belief in what it did.

Thus, the listing of the mare and the consequential misrepresentation was not done wilfully, maliciously, wantonly, or oppressively. After Claiborne Farm was told of Keck's disagreement with the sale, it contacted the Jockey Club again to verify its practice. Although there is disagreement as to what Claiborne was told by the Jockey Club at that time, nevertheless, Claiborne Farm was not advised that its practice was improper or contrary to the practice in the industry. Additionally, Keck was not careless or negligent in turning over the care of his mare to Claiborne Farm, since it had an excellent reputation in the thoroughbred horse industry for honesty and fair dealing. It has cared for some of the outstanding stallions, including Secretariat, and is generally regarded as one of the leading farms in the industry.

After Wacker attempted to rescind the sale, Keck refused to accept the mare and it has since been kept at Spendthrift Farm pending the outcome of this suit. The parties have agreed that the boarding bill, and other incidental expenses, such as insurance, at Spendthrift should be borne by the party who eventually gets the horse.

Although the Court finds that all elements of actionable fraud, save scienter, are present, when rescission of the sale is granted, there are no damages except for the consequential damages concerned with the care of the mare during the pendency of this case. Of course, defendants have incurred attorneys' costs and other costs in connection with this action, but, as seen *infra*, those are not recoverable.

## CONCLUSIONS OF LAW

This Court has diversity jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1332. Although not pleaded in specific terms in the complaint, the provisions of the Uniform Commercial Code as adopted in Kentucky Revised Statutes, Chapter 355, are applicable to the sale of the mare in this case under *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

When the sale and auction was made at Keeneland, title to the mare passed to Mrs. Wacker, and through her agents, Wacker and Hirsch, she accepted the mare under KRS 355.2–606. On the other hand, through her agent, Wacker, she revoked the sale of the horse whose nonconformity substantially impaired its value to her under KRS 355.2–608(2):

> Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

The Court has already found as facts that Wacker notified Keck within a reasonable time (which definition is found in KRS 355.-1–204) after he found the mare had slipped and asked to void the sale.

Then pursuant to KRS 355.2–608(3), the buyer, Mrs. Wacker, who revoked, had the same right and duties with regard to the goods involved as if she had rejected them. This includes the right to reject the horse, KRS 355.2–601(a). It means that since acceptance was revoked, the burden placed on the buyer to establish any breach with respect to the goods ac-

cepted, KRS 355.2–607(4), does not apply. Thus, although not specified in the Uniform Commercial Code, it follows that where acceptance is not effective, the burden is on the seller to show conformity with the description. See *Miron v. Yonkers Raceway, Inc.,* 400 F.2d 112 (2d Cir. 1968). Of course, that case applied New York law, but it was an interpretation of the same provisions of the Uniform Commercial Code as found in Kentucky's statutes. The Court is unable to find any applicable Kentucky cases, so it must decide this case the way the Kentucky Supreme Court would do if presented with the same issue. See *Commissioner v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Orfield v. International Harvester Co.,* 535 F.2d 959 (6th Cir. No. 75–1757 May 7, 1976).

The seller, Keck, has not proven that the mare conformed to the description. It would have required proof that PLAGE was either barren when sold, which it was not, or that a usage of trade under KRS 355.1–205(2) that mares pronounced in foal and later found empty without evidence of an abortion are to be described as "barren," which also was not correct. Nevertheless, even if this burden had been upon the buyer, Mrs. Wacker, the Court would have found the same facts.

■ The attempted sale of the mare, PLAGE, shall be rescinded and declared null and void. Pursuant to KRS 355.2–715, Mrs. Wacker shall recover expenses in connection with the insuring, care, custody, and preservation of the subject mare, from January 15, 1974, to date, and her allowable costs expended herein. By agreement, evidence on that subject was deferred until after the Court passed on the plaintiff's cause of action.

■ Besides asking for a rescission of the contract, the defendants have asked for damages for fraud. Certainly, such damages may be granted, pursuant to KRS 355.2–721. However, the defendants have the burden of proving fraud by clear and convincing proof. See *Terrill v. Carpenter,* 143 F.Supp. 747 (E.D.Ky.1956), aff'd, 249 F.2d 142 (6th Cir. 1957); *Sanford Construction Co. v. S & H Contractors, Inc.,* 443 S.W.2d 227 (Ky.1969). The state rule on burden of proof, of course, is followed in diversity cases. *O'Brien v. Willys Motors, Inc.,* 385 F.2d 163 (6th Cir. 1967). The Court has not found actionable fraud to have been proven by clear and convincing proof, as stated previously.

■ The standard for actionable fraud is that the "misrepresentation must be made with knowledge of its falsity or under circumstances that do not justify a belief in its truth." *Walser v. Glenn,* 400 S.W.2d 223, 224 (Ky.1966). Similarly, it has been held that the essential elements of actionable fraud are:

(1) that [the seller] made a material representation;

(2) that it was false;

(3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion;

(4) that he made it with intention of inducing [the buyer] to act, or that it should be acted upon by [the buyer];

(5) that [the buyer] acted in reliance upon it, and

(6) that [the buyer] thereby suffered injury.

*Sanford Construction Co. v. S & H Contractors, Inc., supra,* 443 S.W.2d at 231, citing *Crescent Grocery Co. v. Vick,* 194 Ky. 727, 240 S.W. 388 (1922).

■ Had the Court found actionable fraud, the principal (Keck) would have been liable for the fraudulent acts of his agent (Claiborne Farms), even though he did not know of the misrepresentation. See *Liberty National Bank & Trust Co. v. Gruenberger,* 477 S.W.2d 503 (Ky.1972); *Isaacs v. Cox,* 431 S.W.2d 494 (Ky.1968).

■ Punitive damages are not warranted in this case. There was no evidence that the description of the mare in the catalogue was done wilfully, maliciously, wantonly, or oppressively. Without such evidence, puni-

**1384**

tive damages cannot be granted. The conduct must be outrageous, so that the Court may punish the offender and deter others; see, *e. g., Bisset v. Goss,* 481 S.W.2d 71 (Ky.1972); *Ashland Dry Goods v. Wages,* 302 Ky. 577, 195 S.W.2d 312 (1946); or such damages may be granted where there is proof of gross neglect or disregard for the rights of others, *Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759 (Ky.1974). None of these factors was shown here. Moreover, assuming arguendo that the conduct by Claiborne Farms was such as to warrant punitive damages, Keck might not be liable for punitive damages unless he participated in the act, ratified it in some way, or was careless or negligent in selecting Claiborne Farms as the agent to keep records on his mare. See, *e. g., Smith's Adm'r v. Middleton,* 112 Ky. 588, 66 S.W. 388 (1902); *Hawkins & Co. v. Riley,* 56 Ky. 101 (1856).

The defendants are not entitled to attorneys' fees, since they are not to be granted in the absence of a statute authorizing them. *Holsclaw v. Stephens,* 507 S.W.2d 462 (Ky.1973); *Dulworth & Burress Tobacco Warehouse Co. v. Burress,* 369 S.W.2d 129 (Ky.1963). No Kentucky or federal statute authorizing such fees in this type of case was cited by the parties, so the Court concludes that there are none.

The complaint filed by the plaintiff, Howard B. Keck, be and is dismissed at the cost of the plaintiff. A judgment in accordance with this opinion will be prepared after further proof is adduced in connection with the care of the mare.