George ALPERT and Lee Wolfman

v.

Susan THOMAS.

Civ. A. No. 85–143.

United States District Court,
D. Vermont.

Sept. 8, 1986.

Jessel Rothman, Mineola, N.Y., Albert A. Raphael, Jr., Waitsfield, Vt., for plaintiffs.

Robert D. Rachlin, Downs, Rachlin & Martin, Burlington, Vt., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BILLINGS, District Judge.

After a trial before the Court without a jury on June 9–11, 1986, the Court has considered the evidence presented at trial and the briefs and proposed findings of facts and conclusions of law submitted by the parties, and makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

## FINDINGS OF FACT

Plaintiffs, George Alpert and Lee Wolfman, citizens and residents of Arizona, brought this civil action against defendant, Susan Thomas, a citizen of Vermont, to recover the remaining purchase price, plus interest and costs, on an Arabian stallion named Raxx, sold by plaintiffs to defendant on March 15, 1984. Defendant counterclaims for recission of the sale or, in the alternative, for damages arising from plaintiffs' breach of express and implied warranties, fraud and misrepresentation. The amount in controversy is $175,000.00, exclusive of interest and costs, which is the sales price of Raxx, the subject of this lawsuit.

Defendant, Susan Thomas, is the owner and operator of Putney Ridge Farm, a horse farm in Putney, Vermont. As of February, 1984, she was a full-time farm operator and breeder, owning several Crabbet mares. Plaintiffs George Alpert and Lee Wolfman are partners and owners of Georgian Hill Arabians, which trains, breeds and sells Arabian horses for profit. Prior to the transaction involved in this lawsuit, Georgian Hill Arabians had consigned seven or eight mares for sale at auctions and had sold shares in a breeding stallion. George Alpert, through Georgian Hill Arabians, holds himself out as having knowledge and skill peculiar to the purebred Arabian horse business. Georgian Hill Arabians also employs agents who hold themselves out as having such knowledge and skill. Lee Wolfman is a silent partner of Georgian Hill Arabians.

In February, 1984, Thomas was in Scottsdale, Arizona for a horse show when she first heard of the horse Raxx, a twenty-month old Russian-Arabian stallion owned by Alpert and Wolfman. (All dates mentioned hereafter refer to 1984, unless noted otherwise.) Thomas visited Georgian Hill Arabians at this time to view Raxx. She met and spoke with Jon Mallory, then general manager of Georgian Hill Arabians. Plaintiffs had given Mallory full authority to sell Raxx and to take any action necessary to remedy problems arising after the sale. Thomas, with Mallory's permission, examined Raxx's configuration and general physical condition. Because Thomas is not a veterinarian, she did not have the necessary skills or equipment to perform a breeding soundness evaluation. After looking Raxx over, Thomas became interested in purchasing the horse; she felt that Raxx would work well with her breeding program.

Georgian Hill Arabians understood that Thomas was purchasing the horse for breeding purposes. Several days later, while still in Arizona, Thomas again met Mallory at a cocktail party at the Equestrian Manor. Thomas inquired if Raxx was for sale. Mallory said the horse was for sale at a non-negotiable price of $175,-000.00. Thomas told Mallory that prior to purchasing the horse she would want a collection of sperm to test his breeding soundness, in order to evaluate and guarantee his ability to breed. The credible evidence indicates that Mallory said he would take care of it. He also advised Thomas that Raxx would be eligible for Georgian Hill Arabians' breeding promotion program after the horse was delivered to her. After Thomas returned to Vermont, she decided to purchase Raxx. To that end she had several telephone conversations with Mallory over the terms of the sale. Again she requested Mallory to have a collection and a breeding soundness evaluation, to which Mallory agreed. It is customary in the industry to have a breeding soundness guarantee where, as here, defendant was purchasing the horse for the purpose of commercial breeding. Despite the agreement between Thomas and Mallory, no collection or evaluation was ever done by Mallory at plaintiffs' farm.

On March 15, Mallory, on behalf of the plaintiffs, flew to Vermont with a purchase and sale agreement prepared by plaintiffs. When she examined the agreement, Thomas indicated to Mallory that it did not say anything about a breeding soundness guarantee. Mallory, in his capacity as general manager of Georgian Hill Arabians, orally stated that the horse was guaranteed

breeding sound.[1] The credible evidence also indicates that Mallory repeated his promise that the collection test would either be done prior to shipping or had already been done. After being assured of Raxx's breeding soundness, Thomas executed the purchase and sale agreement. The agreement contained an "as is" clause in small, inconspicuous type.[2] As a result of the statements and promises of Mallory, the "as is" clause was not intended by either party to apply to Raxx's breeding soundness, but rather only to apply to his general physical health. The agreement did not contain a "merger" clause.

Subsequent to the execution of the purchase and sale agreement there were a number of phone calls between Mallory and Thomas wherein Mallory, among other things, indicated that Raxx would continue to be registered in plaintiffs' name and mortality insurance for Raxx would be kept in plaintiffs' name despite the fact that the horse would be in Thomas's possession. The reason for this is unclear: there was testimony at trial that plaintiffs' continued interest in Raxx would last until his chronological two-year birthdate, which would be in June, for capital gains tax purposes. However, Mallory stated that plaintiffs' continued interest in Raxx would last until Thomas fully paid for the horse. (*See* Court Exhibit 2, page 30. *See also* Plaintiffs exhibit 2, Security Agreement, at p. 3–4.)

In May, Thomas arranged to have Raxx transported first to Massachusetts, and then to defendant's farm in Vermont, by one Ed Hayes. When Raxx arrived at the defendant's farm, she examined him and found a bump on his front leg, which occurred during transport; otherwise he had suffered no injury. Thomas received several documents along with Raxx at the time of his delivery. Included among these documents was a veterinarian bill, which Thomas took to represent the cost of the breeding soundness evaluation performed in Arizona. As mentioned above, despite the parties agreement that Georgian Hill Arabians would arrange for a breeding soundness test, no such test was actually performed.

The following month Thomas executed a promissory note in the amount of $116,-667.00, payable in eight quarterly payments of $14,583.38 with 12% interest. On the same day Thomas also executed a security agreement in favor of plaintiffs. From the face of these documents it appears that they were executed on June 15, although by correspondence it appears that they were actually executed subsequent to June 18. As of this time defendant paid to plaintiffs a total sum of $58,333.33 towards the purchase of Raxx.

During June and July Thomas bred Raxx to four mares at Putney Ridge, and although the process was successful and without injury to Raxx, none of the mares settled. In August Raxx was transported to Sedgewood Farms in Plaineville, Massachusetts and remained there until the middle of October 1984, under the care and supervision of Dag Hultgreen, manager of Sedgewood Farms. Raxx was bred to two mares, again without injury. Once again Raxx failed to settle any mare. Because Raxx was still registered under plaintiffs' names, George Alpert signed the stallion breeding reports required by the various horse registries after each attempted breeding. It is customary for someone to be present at all times during the breeding process. Any traumatic injury to Raxx's testicles while he was breeding would have been readily observed by Thomas, Hult-

---

1. Counsel for plaintiffs strenuously denied that Mallory gave Thomas a breeding soundness guarantee at the time she signed the contract; however, the evidence admitted at trial is not contradictory on this point. Mallory testified that he did not remember whether he gave Thomas a breeding soundness guarantee at the time she signed the contract. *See* Exhibit 2, Mallory deposition as p. 52, 97.

2. Clause 9(i) of the Purchase and Sale agreement appears as follows:

   THOMAS accepts STALLION as is and subject to any and all faults or defects which may exist at the present or may appear at a later date.

green and others supervising the breeding. The fact that no such observation was ever made leads to the inference that Raxx received no traumatic injury while mating. Indeed, the Court finds that Raxx did not receive a traumatic injury to his testicles nor was he substantially changed in any way after delivery to Thomas.

During early October Kenneth MacLeod, then plaintiffs' farm manager, called Thomas and indicated that she had not made the October payment. Thomas advised MacLeod that she would have to sell some stocks in order to make the payment, since there had been no stud fees and there appeared to be a breeding problem. MacLeod stated he was not involved with the transaction and only wanted the money then due.

Because Raxx was having problems settling a mare, Thomas asked Hultgreen to take Raxx to Dr. S. Thomas Butera, D.V.M. for a "breeding evaluation" examination at his hospital in Uxbridge, Massachusetts. Dr. Butera performed the examination on October 18, 1984. As a result of this examination, Dr. Butera concluded that Raxx's breeding capability was questionable. He advised that the parties wait a few months to perform another evaluation, as the problem might resolve itself. He also advised that Thomas not breed Raxx until the next evaluation, and Thomas followed this advice and did not breed Raxx again.

Upon receipt of Butera's evaluation, Hultgreen called Thomas, who was at the National Horse Show in Louisville, Kentucky, and told her of the results. Thomas then saw Mallory at the horse show and told him that there was a serious breeding problem and advised him of Dr. Butera's findings. Mallory felt that the problem required more time and study before its source could be determined. The credible evidence indicates that Mallory assured Thomas of her breeding soundness guaran-

tee, stating "you are covered" and Georgian Hill Arabians will "make it right." In the meantime Mallory contacted a Dr. Squires, a reproductive horse specialist in Colorado, and advised him of the problem. Dr. Squires also advised that the problem might well resolve itself due to Raxx's age. In any event, Dr. Squires advised, the parties should wait until spring and then have Raxx re-evaluated. As a result of Mallory's assurance and the doctors' advice, Thomas made a payment on October 26, 1984 of $18,900.06, being $14,583.38 principal and $4,316.68 interest. She then paid $17,645.89 on December 31, 1984, being $14,583.38 principal and $3,062.51 interest. Thomas then had no further contact with Mallory or Georgian Hill Arabians until she was in Scottsdale, Arizona, in February, 1985.

Returning to the sequence of events in 1984, in late October or early November, Hultgreen and Mallory talked on the telephone in connection with Mallory's prior promises to promote Raxx as a breeding stallion and to attend an Open House at defendant's farm, sponsored by Sedgewood Farms, which had recently moved to Vermont. The credible evidence indicates that Mallory again stated, in regard to Raxx's breeding problems, that Georgian Hill Arabians was "going to make it right" and "don't worry, all will come out whole." Mallory indicated that, despite the prospective breeding problems, the promotion should continue and although he couldn't attend the Open House on November 17, due to a scheduling conflict, Peter Blake, the marketing director for plaintiffs' farm, would attend.

The Open House was held as planned on November 17, between the hours of 1:00 p.m. and 7:00 p.m. with between 500 and 600 people present. While Raxx was shown to the group, Blake made several statements about Raxx and his value as a breeder.[3]

---

**3.** For instance, Peter Blake stated:

"Of course, we know that one of the reasons for going with straight this or pure that [such

as Raxx, a pure Russian Arabian] is the predicability of the breeding....

"George Alpert and Jon Mallory wanted me to tell the people here, as I've re-emphasized

On March 1, 1985, Dr. Butera re-examined Raxx, who had not been bred since September of 1984. Butera reported that Raxx's breeding capability was "extremely suspect," and he concluded that there was no "reason for hope as a breeding prospect at this time." Dr. Butera stated that he could not determine whether Raxx's infertility was congenital or traumatically induced. On March 2, 1985, Hultgreen called Mallory to inform him of Butera's findings and conclusion. Hultgreen couldn't reach Mallory and spoke with MacLeod instead, who by this time had succeeded Mallory as general manager of Georgian Hill Arabians and who had been endowed with the same plenary authority regarding Raxx that had been previously enjoyed by Mallory. Hultgreen gave MacLeod Raxx's breeding history and Dr. Butera's telephone number. MacLeod stated that he would get back to Hultgreen shortly.

On March 7, 1985, having had no response from Georgian Hill, Hultgreen again called Mallory, and again spoke to MacLeod instead. MacLeod stated that he wanted a written appraisal, which was sent. MacLeod also indicated he would call Butera on March 8, 1985, after which the plaintiffs would respond in connection with the problem with Raxx. Hultgreen, during the following days, and especially on March 20, 1985, tried to get in touch with MacLeod and/or Mallory and was unable to do so, nor did he receive any calls from either of them. At the time Hultgreen thought MacLeod and the plaintiffs were "stonewalling the problem", so on March 21, 1985, Hultgreen wrote and contacted Attorney John Alan Cohan in California, who, on March 26, 1985, sent a letter revoking the entire contract on behalf of Thomas to

George Alpert at Georgian Hill Arabians. Given Thomas's earlier notification to the sellers of Raxx's problem, the assurances of Mallory and the doctors' advice to "wait and see", the Court finds that Thomas revoked the sale of the stallion within a reasonable time.

All of Thomas's contact with Georgian Hill Arabians, both personal and through Hultgreen, was through either Mallory or MacLeod, who were acting as agents of the plaintiffs. At no time did Thomas ever have direct contact with the plaintiffs themselves.

On July 5, 1985, Thomas had Raxx re-evaluated by Dr. Gordon L. Woods, D.V.M., Ph.D., of the New York College of Veterinary Medicine. Dr. Woods stated that Raxx has a "low number of morphologically normal, progressively motile sperm." Dr. Woods concluded that, under the guidelines of the Society for Theriogenology, Raxx was an "unsatisfactory prospective breeder," which is the lowest rating given by the Society. He recommended that Raxx be booked to no more than ten mares a year, and he cautioned that Raxx "may have difficulty impregnating even this few number of mares." Dr. Woods concurred that the cause of Raxx's infertility could not be determined; however, he felt that testicular trauma was most likely not the cause. He also stated that it was unlikely that Raxx's reproductive performance would improve. Dr. Woods and Dr. Butera agreed that any problem which might arise as a result of breeding a stallion when he is young would be psychological in nature; according to the doctors, early breeding would have no physiological effects. Dr. Woods and Dr. Butera also agreed that Raxx's brief episode of colic would have

to Susan, that Georgian Hill is definitely going to back her up in any way they can in cooperating in making sure that Raxx, and later on his offspring, are handled correctly and have a marketing outlet through Georgian Hill in Scottsdale and that Karho [another, large Arabian horse farm in Scottsdale] has assured them that Raxx and Raxx's offspring will be considered for Karho sales....

"We've got enough samples of what Muscat [Raxx's sire] has done and then in turn what

his sons are doing, and that's where Susan became convinced that Raxx would be a good outcross for her [crabbet mare] horses.... I think that you'll agree. We'd be happy, any of us to talk to you about how Raxx and the program Susan Thomas is putting together here might be of interest to you in breeding really good Arabians that you're going to enjoy."

only a temporary, rather than long-lasting or permanent, effect.

In November, 1985, Raxx was again re-examined, this time at the request of the plaintiffs, by Dr. Jagdish Patel, B.V.M., at Tufts University. In his report Dr. Patel stated that although Raxx has excellent libido, he has a deficiency of "progressively motile morphologically normal spermatozoa." Dr. Patel reached the same conclusion as Doctors Butera and Wood; Raxx was an "unsatisfactory prospective breeder" according to the guidelines of the Society of Theriogenology. Although Dr. Patel performed an ultrasonography and other detailed examinations upon Raxx to determine the cause of the infertility, Dr. Patel concluded that he could not determine whether the problem was congenital or traumatically induced.

The value of Raxx in his present condition is $10,000, but under the promissory note executed on June 15, 1984, the principal unpaid balance is now $87,524.00. Thomas has paid $94,879.28 towards the purchase price. Thomas reasonably incurred the following expenses in the transportation, care, custody and insurance of Raxx: $14,700 for insurance; $2,760 for training; $1,400 paid to the farrier; $2,400 of veterinarian expenses; and $4,300 for feed.

## DISCUSSION AND CONCLUSIONS OF LAW

█ This Court has diversity jurisdiction over the parties and subject matter of this dispute pursuant to 28 U.S.C. § 1332. The provisions of the Uniform Commercial Code are applicable to the sale of the stallion in this case. *See* U.C.C. § 2–105(1); *Sessa v. Riegle*, 427 F.Supp. 760, 764 (E.D. Pa.1977); *Keck v. Wacker*, 413 F.Supp. 1377, 1382 (E.D.Ky.1976); *Presti v. Wilson*, 348 F.Supp. 543, 545 (E.D.N.Y.1972); Annot., 4 A.L.R. 4th 912, 920–21 (1981); Cohan, "The Uniform Commercial Code as Applied to Implied Warranties of 'Merchantability' and 'Fitness' in the Sale of Horses," 73 Ky. L.J. 665, 666 (1985) [hereinafter cited as *"Cohan"*]. *Cf. Lemnah v.*

*American Breeders Serv., Inc.*, 144 Vt. 568, 578, 482 A.2d 700 (1984) (agreement on distribution of bovine semen covered by UCC). The question then becomes which state's law should be applied. Plaintiffs argue that Arizona's version of the UCC should apply, while defendant contends that Vermont's version applies.

## I. CHOICE OF LAW

█ A federal court sitting in diversity must apply the conflict of laws rules of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore, this Court must look to the conflict of laws rules of Vermont to determine whether Arizona or Vermont law shall apply to this case. The U.C.C. as adopted by Vermont contains its own choice of law rule. *See* 9A V.S.A. § 1–105(1). This statute indicates that, absent agreement between the parties as to which state's substantive law shall govern their rights and duties under the contract, "this title applies to transactions bearing an appropriate relation to this state." *Id.* Comment 3 following § 1–105(1) indicates that this statute applies where the choice of law at issue is between a state or country which has enacted the UCC and one which has not. *See also Silver v. Sloop Silver Cloud*, 259 F.Supp. 187, 191 (S.D.N.Y.1966). Both Arizona and Vermont have adopted the UCC. Accordingly, this Court must look to other conflict of law rules adopted by Vermont to determine which state's substantive law shall apply.

Vermont has frequently cited with approval the A.L.I. Restatement of Conflict of Laws. *See, e.g., Pioneer Credit Corp. v. Carden*, 127 Vt. 229, 233, 245 A.2d 891 (1968) (citing § 188 of proposed draft, part II, May 1, 1968, which was essentially identical to current provision); *General Acceptance v. Lyons*, 125 Vt. 332, 335, 215 A.2d 513 (1965) (citing § 332a tentative draft No.

6, 1960). Section 191 of the Restatement (2d) of Conflict of Laws states:

> Contracts to Sell Interests in Chattel The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship....

■ Arizona was the state where Raxx was to be delivered to Thomas under the terms of the contract. Although the general rule would therefore make the law of Arizona the applicable substantive law, the facts of this case bring it within the "unless" provision of § 191. Comment f of § 191 explains that the "unless" provision may apply "when the contract contemplates a continued relationship between the parties which will be centered in a state other than that where delivery took place." The contract by which Thomas purchased Raxx clearly contemplated a continuing relationship between the parties, a continuing relationship that would be centered in Vermont. It was understood between the parties at the time of contracting that after Thomas took possession of Raxx and brought the horse to Vermont, plaintiffs would remain involved with the care, breeding and promotion of the horse. After Thomas took delivery plaintiffs continued to carry insurance on Raxx. Four of the six attempts to breed Raxx took place in Vermont. George Alpert, who remained the registered owner of the horse, signed Raxx's breeding reports pursuant to the Arabian Horse Registry requirements. Plaintiffs consulted with Thomas, Hultgreen and the veterinarians about Raxx's condition after the sale. Prior to execution of the contract, Mallory stated that Raxx would be eligible for Georgian Hill's breeding promotion program. Peter Blake, a representative of Georgian Hill Arabians in fact attended Thomas's open house and enthusiastically promoted Raxx. Accord-

ingly, under the "unless" provision of the Restatement (2d) of Conflict of Laws § 191, the substantive law of Vermont applies to the present dispute. *Accord: Collins Radio Co. of Dallas v. Bell*, 623 P.2d 1039 (Okl.App.1980).

■ In any event, the parties concede that the only relevant difference between the law of the two states concerns U.C.C. § 2–316(3)(a). Vermont has changed the official version of this section from "all implied warranties are excluded by expressions like 'as is'" to "implied warranties of fitness may be excluded by expressions like 'as is'." 9A V.S.A. § 2–316, Historical Notes. Therefore, in Vermont, unlike Arizona, the implied warranty of merchantability may not be excluded under § 2–316(3)(a) by an "as is" clause such as the one present in the contract at issue here. In the present case, however, neither the Arizona nor the Vermont version of § 2–316(3)(a) operates to exclude the implied warranty given by Georgian Hill Arabians. *See infra.* Accordingly, the choice of law issue, as it relates to the present case, is largely irrelevant.

## II. NON–CONFORMITY

In defense of plaintiffs' claim for the amount that remains due under the purchase and sale agreement and promissory note, Thomas asserts that she properly revoked her acceptance of Raxx due to his inability to conform to the contract. Plaintiffs counter with the assertion that plaintiff did not properly revoke her acceptance and, in any event, Raxx conformed to the contract. We begin by analyzing Raxx's conformity to the contract between Thomas and Georgian Hill Arabians.

■ All of the doctors who examined Raxx concluded that he was an unsatisfactory prospective breeder. As such, Raxx failed in two ways to conform to the contract under which Georgian Hill Arabians sold him to Thomas. First, Raxx's infertility rendered him in breach of express warranties created pursuant to 9A V.S.A.

§ 2–313.[4] Mallory, acting under complete authority to sell Raxx, assured Thomas that Georgian Hill Arabians would conduct a breeding soundness evaluation of Raxx and that Raxx was breeding sound. Thomas relied upon Mallory's assurances when she signed the purchase and sale agreement, rendering Mallory's statement part of the basis of the agreement between Georgian Hill Arabians and Thomas.[5] Plaintiffs' defense that Mallory's statements are barred from consideration by the "doctrine of contract merger" is unavailing where, as here, the purchase and sale agreement contained no "merger clause" and therefore it cannot be said that this agreement was a writing "intended by the parties as a final expression of their agreement." *See* 9A V.S.A. § 2–202; J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 2–10, at 81 (1980) [hereinafter cited as *"White and Summers"*]. Nor can plaintiffs cogently claim that any statements made by Mallory at the time of the sale were outside his authority and not binding upon plaintiffs. Plaintiffs gave Mallory full authority to negotiate the sale and handle any problems that arose in that connection. Thomas dealt only with Mallory in negotiating the sale; she never met the plaintiffs. Thus plaintiffs are responsible for any representations, or misrepresentations, made by Mallory during the course of negotiations over Raxx. *See Negyessy v. Strong,* 136 Vt. 193, 195, 388 A.2d 383 (1978); *Blitz v. Breen,* 132 Vt. 455, 458–59, 321 A.2d 48 (1974).

■ The second non-conformity which substantially impaired Raxx's value to Thomas was his failure to conform to Georgian Hill Arabians's implied warranty that he was merchantable. 9A V.S.A. § 2–314 provides:

(1) Unless excluded or modified (§ 2–316) a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a *merchant with respect to goods of that kind* ...

(2) Goods to be merchantable must be at least such as

.    .    .    .    .

(c) are fit for the ordinary purposes for which such goods are used....

(emphasis supplied). In situations such as the present one, where plaintiffs knew that Raxx was being purchased for the purpose of breeding, custom and usage in the horse trade indicates that the implied warranty of merchantability includes the warranty that the stallion is fertile and capable of getting a mare in foal. *Cohan,* 73 Ky. L.J. at 667, and cases cited therein. Thus, assuming for the moment that the other prerequisites to 9A V.S.A. § 2–314 are met, Raxx's inability to breed renders him in breach of the purchase and sale agreement's implied warranty of merchantability.

■ Plaintiffs contend, however, that they are not merchants and therefore the implied warranty of merchantability may not be applied to the sale of Raxx. This contention must fail. The U.C.C. defines a merchant as:

a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom

---

**4.** 9A V.S.A. § 2–313 provides:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promises.

....

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a

warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

**5.** Because Mallory's statements prior to the sale created an express warranty regarding Raxx's ability to fertilize a mare, it is not necessary to reach the issue of whether an express warranty was also created by Mallory's post-sale assurances that, if Raxx could not breed, Georgian Hill Arabians would "make it right."

such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

9A V.S.A. § 2–104(1). Plaintiffs, as owners of Georgian Hill Arabians, meet this definition in all regards. Georgian Hill Arabians deals in Arabian purebred horses; George Alpert holds himself out as having knowledge and skills peculiar to the practices and goods involved in the Arabian horse business; and Georgian Hill Arabians employs agents, such as Mallory, who also hold themselves out as having such skill and knowledge. Plaintiffs buy and sell Arabian horses as a source of income, and clearly they are not "casual or inexperienced sellers." *See Cohan*, 73 Ky. L.J. at 667–70.

Plaintiffs argue that before they can be definitively characterized as merchants, Thomas's intended use for Raxx—that is, breeding—must coincide with the horse classification with which they deal or have knowledge. *Id.* at 670. Plaintiffs cite *Fear Ranches, Inc. v. Berry*, 470 F.2d 905 (10th Cir.1972), *aff'd* 503 F.2d 953 (10th Cir.1974), contending that, like the seller in that case, they are not merchants within the meaning of § 2–314 because they had never before sold animals for the buyer's intended purpose of breeding.

■ In *Fear Ranches*, the defendants owned a ranch and previously had sold all the cattle they raised to packers. *Id.* at 907. The sale to the buyer "was their first sale to a non-packer, and 'was forced by financial difficulties.'" *Id.* Moreover, the seller had no reason to know that the buyer intended to use the cattle for breeding purposes. *Id.* at 907–8. The present case is distinguishable from the facts in *Fear Ranches*. Here, plaintiffs knew that Thomas was purchasing Raxx for breeding purposes. Moreover, plaintiffs, through Georgian Hill Arabians, had sold Arabian horses for breeding prior to the sale of Raxx. Through auctioneers they had sold seven or eight mares for breeding purposes, and they had sold shares in a breed-

ing stallion. Thus, unlike the seller in *Fear Ranches*, plaintiffs were merchants with respect to goods used for the buyer's intended purpose. Accordingly, 9A V.S.A. § 2–314 applies to the sale of Raxx and, as an unsatisfactory prospective breeder, Raxx failed to conform to the implied warranty of merchantability.

Plaintiffs further argue that despite Raxx's infertility, he conformed to the contract under Clause 9(i) thereof, quoted *supra* in the margin. To serve as an effective disclaimer of Georgian Hill Arabian's express and implied warranties, this "as is" clause must satisfy the U.C.C.'s test outlined in § 2–316. 9A V.S.A. § 2–316 provides in relevant part:

Exclusion or modification of warranties

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (§ 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

.     .     .     .     .

(3) Notwithstanding subsection (2) [relating to, *inter alia*, the conspicuousness requirement of written disclaimers]

(a) unless the circumstances indicate otherwise, all implied warranties of fitness may be excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

. . . . .

In this case, clause 9(i) of the purchase and sale agreement fails, under the provisions of § 2–316, to effectively disclaim the contract warranties. Subsection (1), relating to the disclaimer of express warranties, states that Mallory's oral representations that Raxx was warranted to be breeding sound and clause 9(i), which negates this warranty, "shall be construed wherever reasonable as consistent with each other...." As a result of this statutory directive and a review of the evidence at trial, including the course of negotiations between Mallory and Thomas, the Court found as a matter of fact, *see supra*, that clause 9(i) was not intended by either Thomas or the plaintiffs to apply to the express warranty that Raxx was breeding sound. The Court found that the parties intended clause 9(i) to apply to Raxx's general physical health.

Similarly, clause 9(i) fails under § 2–316(3) to adequately disclaim plaintiffs' implied warranty that Raxx was merchantable as a breeder. First, subsection (3)(a) provides that implied warranties may be excluded by expressions like "as is" or other expressions which would normally call the buyer's attention to the fact that the implied warranty is excluded, "unless the circumstances indicate otherwise." In this case, the circumstances indicate otherwise. The course of negotiations between Mallory and Thomas indicates that, despite the presence of clause 9(i) in the purchase and sale agreement, the parties intended that Raxx would be merchantable as a breeder, as is the custom in the Arabian horse trade when the seller knows that the buyer intends to use the horse for breeding purposes. Second, subsection (3)(b) pro-

vides for exclusion of implied warranties with regard to defects that the examination should have revealed under the circumstances where the buyer examined the goods as fully as he desired or refused to examine the goods. In this case, the parties understood that George Hill Arabians, not Thomas, would examine Raxx for his breeding soundness, and plaintiffs made no demand of Thomas that she examine Raxx. *See* Comment 8 to § 2–316. Thus, it cannot be said that Thomas refused to examine Raxx for his breeding ability. Nor can it be said that Thomas's failure to conduct her own breeding tests at the time she examined the horses physical characteristics operates under subsection (3)(b) to exclude the implied warranty that Raxx was merchantable as a breeder. Thomas understood that Georgian Hill Arabians would perform the breeding soundness exam, and she did not have the necessary skills or equipment to perform such an exam herself when she looked at the horse. *See id.* Last, plaintiffs cannot rely on subsection (3)(c) to exclude or modify the implied warranty that Raxx was merchantable as a breeder. Far from excluding or modifying such a warranty, the parties' course of dealing and performance and the usage of the Arabian horse trade all indicate that this implied warranty was part of the parties' contract. Accordingly, plaintiffs cannot disclaim or modify the express and implied warranties that Raxx was a suitable breeder under § 2–316.[6]

## III. REVOCATION

As a result of Raxx's non-conformity to the express and implied warranties that he would be breeding sound, Thomas claims that she revoked her acceptance of Raxx.[7] A buyer's revocation of acceptance of goods must satisfy the provisions of § 2–608. This statute states:

---

6. As a result of this holding, the Court sees no need to pass judgment on defendant's contentions that § 2–316(2) requires an "as is" clause to be conspicuous or that under Vermont law § 2–316(3)(a) does not apply to implied warranties of merchantability.

7. The parties do not dispute the conclusion that Thomas accepted Raxx pursuant to § 2–606 of the U.C.C.

Revocation of acceptance in whole or in part

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-confirmity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) a buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

9A V.S.A. § 2–608. There are four elements to proper revocation under § 2–608: (1) the goods non-conformity with the contract substantially impairs the value to the buyer; (2) the buyer's acceptance was (a) forthcoming on the reasonable assumption that the non-conformity would be cured (discovery at time of acceptance) or (b) reasonably induced by the difficulty of the discovery or by the seller's assurances (no discovery at the time of acceptance); (3) revocation occurred within a reasonable time after the nonconformity was discovered or should have been discovered; and (4) revocation took place before a substantial change occurred in the condition of the goods not caused by their own defects. *White and Summers*, § 8–3, at 303.

As to the first element, Raxx's status as an unsatisfactory prospective breeder rendered him in non-conformity with the purchase and sale agreement's express and implied warranties that he would be merchantable as a breeder. *See supra*, part II. Because Thomas was purchasing Raxx for breeding purposes, this non-conformity substantially impaired his value to her.

The second element of proper revocation under § 2–608 is also satisfied because Thomas was induced to accept Raxx without discovering his non-conformity as a result of Mallory's assurances that Georgian Hill Arabians would perform the breeding soundness evaluation and that Raxx was guaranteed to be breeding sound. *See* Comment 3 to § 2–608.

■ This Court has already found as a matter of fact, *see Miron v. Yonkers Raceway, Inc.*, 400 F.2d 112, 118 (2d Cir.1968), that Thomas satisfied the third element of proper revocation in that she formally revoked within a reasonable time after Raxx's non-conformity was discovered or should have been discovered. Among the facts relevant to this finding are: plaintiffs' assurances that they would perform a breeding soundness test rendered the timing of Thomas's discovery of Raxx's infertility reasonable; Thomas promptly notified plaintiffs that Raxx's breedability had become suspect; Thomas or Hultgreen attempted several times to discuss the problem with plaintiffs and Mallory repeatedly replied that plaintiffs would "make it right"; and Dr. Squires' concurred with Dr. Butera's recommendation, made at the time of discovery, that Thomas should wait a few months and see if Raxx's problem would correct itself. *See White & Summers* § 8–3 at p. 309, 312 (one circumstance relevant to determination of whether buyer revoked within reasonable time is the course of performance between the parties).

As to the final element of revocation under § 2–608, the Court found that there was no substantial damage in Raxx's condition not caused by his inability to breed.

■ In sum, the facts of this case indicate that all four elements of § 2–608 have been satisfied. Accordingly, Thomas properly revoked her acceptance of Raxx. Pursuant to § 2–608(3), she had the same rights and duties with regard to the horse as if she had rejected it. This includes the

right to no longer be subject to the requirement, contained in § 2–607(4), that the buyer must prove any breach with respect to goods accepted. Once Thomas properly revoked her acceptance of Raxx, the burden falls upon plaintiffs, as sellers, to prove that Raxx conformed to the contract at the time of the sale. *Miron v. Yonkers Raceway, Inc.,* 400 F.2d at 120; *Keck v. Wacker,* 413 F.Supp. 1377, 1383 (E.D.Ky.1976).[8]

## IV. CONFORMITY AT TIME OF SALE

◼◼◼ Plaintiffs continually asserted that Raxx's infertility could have been caused by an injury to his genital area. This assertion is mere conjecture. Doctors Butera and Patel agreed that it cannot be determined with reasonable scientific certainty whether Raxx's infertility was congenitally induced or the result of a traumatic injury. Dr. Woods found that it was unlikely that trauma would occur to a stallion's genital area. Moreover, the evidence at trial indicated that in fact Raxx received no such traumatic injury. Plaintiffs also cite as potential causes Raxx's "premature" breeding and his brief episode of colic

upon arrival at Sedgewood Farms. The experts agreed, however, that premature breeding, where it occurs, has only psychological effects, whereas Raxx's infertility stemmed only from some physiological problem. They also agreed that colic, a common gastrointestinal illness in a horse transplanted to a new environment, only temporarily affected a horse and had no long-lasting effect on fertility. Thus none of the factors cited by plaintiffs in fact played a role in causing the problem. For this reason, the Court finds that plaintiffs failed to prove that Raxx conformed to the contract at the time he was delivered to Thomas. In any event, the law demands that the burden of proof on an issue be met with more than mere conjecture. *McAdam v. Wrisley,* 134 Vt. 19, 22, 349 A.2d 886 (1975); *Sessa v. Riegle,* 427 F.Supp. 760, 769, citing *Vlases v. Montgomery Ward & Co.,* 377 F.2d 846 (3rd Cir.1967).

## V. REMAINING ISSUES

◼◼◼ Plaintiffs assert promissory estoppel and waiver as additional defenses to Thomas's counterclaim for recission.

---

**8.** Plaintiffs' reliance on *Miron* for the proposition that the burden remains on Thomas is misplaced. In *Miron,* a racehorse named Red Carpet was sold to one Finkelstein under a warranty that it was "sound", but on the day after its sale it was found to have a broken leg. Finklestein refused to pay for the horse, and eventually the seller sued for its purchase price. Finkelstein counterclaimed for breach of warranty. The Second Circuit held that Finkelstein had accepted the horse, and having had a reasonable opportunity at the time of the sale to inspect the horse for any obvious defects such as a broken leg, he did not reject Red Carpet within a reasonable time, as required under § 2–602(1). The Court held that Finkelstein had the burden of proof that the breach existed at the time of the sale. The Court went on to state that if the circumstances had warranted revocation of acceptance, as in the case at bar, then the seller would have the burden of proving conformity with warranties at the time of the sale:

Thus if Finkelstein had carried out the customary inspection and accepted the horse, and the defect allegedly rendering Red Carpet unsound at the time of the sale were a defect not discoverable by inspection on the date of the sale, rather than a broken splint bone, we may presume the District Court would not

have placed the burden of proof on Finkelstein, and would have said that he had "revoked his acceptance."
400 F.2d at 120.

Plaintiffs reliance on *Sessa v. Riegle,* 427 F.Supp. 760 (E.D.Pa.1977) is also unpersuasive. In that case the district court found that the buyer had not effectively rejected his acceptance and therefore concluded that the burden of proving the breach remains on the buyer. In a footnote the Court stated:

While [the buyer] could invoke the remedy of revocation of acceptance under U.C.C. § 2–608, 12A P.S. § 2–608, incidence of the burden of proof would not be affected.
427 F.Supp. at 767, n. 13.

In the present case the Court is unable to find any Vermont cases on the issue of who bears the burden of proof once the buyer is found to have properly revoked his acceptance. Therefore, the Court must decide this case the way the Vermont Supreme Court would if the same issue arose before it. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Keck v. Wacker,* 413 F.Supp. 1377 (1976). The Court finds that the Vermont Supreme Court would be persuaded by the holding of *Miron,* based on New York law, and *Keck,* based on the law of Kentucky.

The evidence at trial does not support either of these defenses. In Vermont, the doctrine of promissory estoppel is stated as follows:

A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promissee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

*Overlock v. Public Service Corp.*, 126 Vt. 549, 552, 237 A.2d 356 (1967), quoting *Restatement of Contracts*, § 90. Promissory estoppel applies to situations where there is no bargain between the parties, only reasonable reliance leading to detriment on the part of one party. *Overlock*, 126 Vt. at 553, 237 A.2d 356. In the present case, Thomas' promise to pay for Raxx was bargained for; Raxx's failure to conform to the contract allowed Thomas to revoke her promise. Moreover, plaintiffs have failed to introduce any evidence supporting application of the doctrine of promissory estoppel. Indeed, the Court finds that the facts of this case support the conclusion that injustice can be avoided only by recission of the contract. Waiver, defined as "the voluntary relinquishment of a known right," *North v. Simonini*, 142 Vt. 482, 485, 457 A.2d 285 (1983), is similarly unavailing. Far from relinquishing her rights, Thomas insisted that plaintiffs live up to their express and implied warranties as soon as she discovered Raxx's breeding ability was questionable.

### CONCLUSION

Judgment shall be entered for defendant Thomas on plaintiffs' complaint; judgment shall be entered for defendant Thomas on her counterclaim. The attempted sale of Raxx shall be rescinded and declared null and void. Plaintiffs will return to Thomas $94,879.28, representing the purchase price already paid for Raxx, plus interest at the rate of 12% p.a. from the date of last payment, December 31, 1984, to the date of judgment. 9 V.S.A. § 41a. Pursuant to 9A V.S.A. § 2–715(1), Thomas shall recover $25,560.00 representing expenses reasonably incurred in transportation, care, custody and insurance of Raxx from date of delivery to the present. As a result of the conclusion reached herein, the Court finds no need to reach Thomas's alternative arguments that common law theories of fraud, misrepresentation and mutual mistake support recission of the contract. Punitive damages, requiring proof of "willful and wanton or fraudulent breach of contract," *see Hilder v. St. Peter*, 144 Vt. 150, 163, 478 A.2d 202 (1984), will not be awarded in this case.

SO ORDERED.