Ronald McKENNY, Plaintiff,

v.

JOHN V. CARR & SON, INC., Defendant.

No. 2:94–CV–30.

United States District Court,
D. Vermont.

March 20, 1996.

---

Craig Weatherly, Gravel & Shea, Burlington, VT, for plaintiff.

Richard Thomas Cassidy, Hoff, Curtis, Pacht, Cassidy & Frame, P.C., Burlington, VT, Thomas H. Somers, Moon, Moss, McGill & Bachelder, P.A., Portland, ME, for defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment in accordance with Fed.R.Civ.P. 56(c). Plaintiff opposes this motion. Both parties have filed affidavits and other documents in support of their memoranda. In his complaint, Plaintiff alleges breach of express or implied contract, promissory estoppel, age discrimination in violation of both state and federal law, and emotional distress. He seeks compensatory and punitive damages. The Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). For the reasons stated below, the Motion is granted in part and denied in part.

### Factual Background

Plaintiff is the former employee of Defendant. The gravamen of Plaintiff's complaint is that he was summarily terminated without just cause and because of his age. Defendant maintains that Plaintiff was an at will employee and that his position was eliminated as part of an economically motivated reduction in force ("RIF").

Resolving all doubts in favor of the non-moving party for purposes of deciding the instant matter, the Court assumes the following facts are true. On June 16, 1993, Plaintiff, Ronald McKenny, was released from his employment with John V. Carr & Son, Inc. ("Carr"). Plaintiff is a resident of Vermont. Carr operates a customhouse brokerage business with a principal place of business in Detroit, Michigan and branch offices in approximately a dozen states. Its purpose is to assist clients involved in international trade by providing, *inter alia*, advise on customs regulations, tariffs and foreign freight forwarding.

The relationship between Plaintiff and Carr first arose in 1984. At that time, Plaintiff, along with his brothers, Stanley McKenny and Douglas McKenny, and Bruce Savage, owned a small customhouse brokerage business, doing business as C.S. Emery & Company, Inc. ("Emery"), in Derby Line, Vermont. On March 26, 1984, following a series of informal discussions between the Emery shareholders and representatives of Carr, the Plaintiff and his fellow shareholders agreed to transfer fifty-one percent of their capital stock to Carr for a purchase price based on the to-be-determined book value of Emery. *See* Def.'s Ex. 1A.[1] Executive Vice Presidents Stephen Marr and Richard Lowrie negotiated the agreement on behalf of Carr.

The transaction was based upon mutual trust and respect. In fact, testifying as to how the deal was concluded, Mr. Lowrie stated:

> And we were in his [Stan McKenny's] parlor and at that time, there was a comfortable feeling and they said to us—all of them—we looked at them individually, it's a deal, it's a deal. I think we felt real comfortable in it because we trusted each other so much. And I know business isn't done that way anymore and I think it's a

---

1. Unless otherwise noted, Defendant's exhibits referenced herein are attached to Paper # 22, and Plaintiff's exhibits are attached to Paper # 31.

damn shame it's not but we did the deal on basically [a] handshake and discussion. Yes, we bought some other companies and some other people had attorneys involved but Steve [Marr], myself and the McKennys and Mr. Savage basically did most of it on a handshake. I think besides trust, respect. I think we had a great deal of respect for each other. We had known not only each other but their families, their children, went to social events, it was that feeling.

Pl.'s Ex. O, Lowrie Dep. at 15, 16.

The agreement was reduced to writing in a document entitled "Agreement for Sale of Corporate Stock" ("Agreement"). It included an option to purchase the remaining shares of Emery. Pursuant to the Agreement, the happening of one or more specified events triggered the option. *See* Def.'s Ex. 1A at § 5.1. The Agreement included a general provision stating: "This Agreement contains the entire agreement of the parties and no representations, inducements, promises, agreements oral or otherwise, not embodied or referenced herein shall be of any force and effect unless in writing and signed by the parties hereto." *Id.* at § 9.1. The terms of the Agreement are to be interpreted in accordance with Michigan law. *Id.* at § 9.6.

Although the Agreement did not address the subsequent employment of Plaintiff and the other Emery shareholders, two of the four Emery shareholders understood their employment to be secure as long as their job performance remained satisfactory. *See* Pl.'s Ex. B, Savage Dep. at 16, 26.; S. McKenny Dep. at 44. The remaining two Emery shareholders, Plaintiff and Doug McKenny, recall receiving specific oral assurances of continued employment as long as they performed their jobs to satisfaction.

Plaintiff testified that Mr. Marr and Mr. Lowrie told the Emery shareholders that "we would continue employment as long as performance was satisfactory" and that "we didn't have to worry because Dick [Lowrie] and Steve [Marr] were going to be around a lot longer than we were because they were younger." Pl.'s Ex. B, R. McKenny Dep. at 71, 69. Responding to a question about the amount of job security he thought the Emery shareholders would have after the sale, Doug McKenny stated that he felt "[p]ossibly more secure [than when his dad was running the company] because we had been verbally advised that our jobs were secure." Pl.'s Ex. B, D. McKenny Dep. at 29.

Moreover, Defendant didn't anticipate any changes in the Emery operations following the sale. When asked whether there was any agreement to continue the employment of the McKennys, Mr. Lowrie stated, "I think that it was in a discussion stage at several discussions, that it was assumed by both parties that things would remain the same." Pl.'s Ex. B, Lowrie Dep. at 24. In a letter to Stan McKenny dated March 26, 1984, Mr. Marr stated, "we would anticipate retaining all current directors of C.S. Emery ... on the Board of Directors of that firm, and adding three or four directors from John V. Carr & Son." Pl.'s Ex. A. The letter also assured Stan McKenny that Carr's bar on nepotism would not apply to the Emery shareholders and their family members. *Id.*

After the 1984 sale, the Emery shareholders continued in their employment and carried on business in the Emery name. Plaintiff remained Vice President of Vermont Operations. On January 2, 1986, Manufacturer's Bank, N.A. ("Manufacturer's") acquired Carr, which then became a wholly owned subsidiary of Manufacturer's. In 1990, Carr purchased the remaining shares of stock from Emery, although apparently none of the triggering events of the Agreement had occurred.

After the final transfer of stock, the Emery shareholders ceased doing business under the Emery name and began trading under Carr's name. At the same time, Plaintiff was re-designated Carr's Technical Advisor for Vermont Operations, although his duties remained the same. In 1992, Manufacturer's merged with Comerica Bank, and Carr became a wholly owned subsidiary of Comerica.

On June 22, 1992, Plaintiff received a copy of Carr's new Employee Handbook. Plaintiff acknowledged receipt of the Handbook by signing a form that was placed in his personnel file. Inside the cover page, the Handbook states:

Irrespective of any statement contained in this Handbook or in any other document or statement issued by the Company or any of its representatives, you have the right to terminate your employment at any time, with or without cause or notice, and the Company retains a similar right. All statements contained in this handbook shall be interpreted consistent with this termination policy and no officer or employee of the Company has any authority to modify this statement in any way.

*See* Def.'s Ex. 2C.

Carr also maintains an Administration Manual that is given to supervisors and managers setting forth the Company's policies and procedures regarding discipline. *See* Pl.'s Ex. A, Douras Dep., attach. to Paper # 17. Parts of the Administration Manual apply to both exempt and nonexempt employees. *Id.* at 16. Plaintiff is an exempt employee.

The purpose of the Administration Manual, as defined therein, is "to inform supervisory and management personnel of the laws which affect the employer/employee relationship; to explain company policies and procedures to those who are responsible for implementing those policies; and to present the JVC approach to employee relations." Pl.'s Ex. V. In a section entitled "Policies and Procedures," the Manual states:

The following material is an elaboration of the policies explained in the Employee Handbook. For brevity's sake, the policies will not be repeated in their entirety, but will be referred to by page number in the Employee Handbook for your review. Additional policies not addressed in the Employee Handbook are also included for your information. Supervisors are responsible for implementation of company policies, which requires communicating and promoting them to your staff and ensuring compliance.

*Id.* Finally, the Manual sets forth a progressive disciplinary system under a section called "Effective Supervision." The preliminary statement to "Effective Supervision" reads: "The material in this section deals with issues which are primarily the responsibility of supervisors. Variations in treatment of individuals by different supervisors under the same circumstances is unfair and destructive of good personnel relations."

It then provides for a three step disciplinary procedure. The first step is an oral reminder, the next is a written reminder, and the third is referred to as decision-making leave. At the third stage, the employee is told to remain home the day after the violation and use that time to decide whether he or she can meet the organization's standards. If the employee returns with a decision to continue employment, the supervisor informs him or her that any future problems may result in the employee's termination.

After the decision-making leave conversation, the supervisor documents the discussion in a written memorandum to the employee, a copy of which is placed in his or her personnel file. The memorandum must contain the following information: the date of the decision-making leave conversation; the specific performance problem or rule violation; the dates and nature of previous conversations about the problem; a statement about the specific change in the employee's behavior or performance that is expected; the duration of the leave; a record of the employee's decision to continue work and follow all the rules; and a statement that any further disciplinary problems will result in the employee's discharge. The Manual also categorizes levels of disciplinary offenses, indicating specific types of conduct constituting minor, serious, and major violations respectively. Def.'s Ex. 3, attach. to Paper # 33. It does not address policies or procedures for RIFs. *Id.*

Throughout his employment with Defendant, Plaintiff's job performance remained satisfactory. In fact, in a 1991 evaluation, his performance was characterized as "largely contribut[ing] to the success of the Vermont operation. He has earned the respect of client and employee alike as well as that of the customs import specialists." Pl.'s Ex. I. There has been no allegation that Plaintiff's job performance changed at any time.

On May 18, 1993, Plaintiff met with Mr. Kilp, then Carr's newly appointed Vice President of Canadian Border Operations, and Mr. Kramer, then Carr's Vice President of Cana-

dian Operations, to discuss what Plaintiff understood to be a proposed separation agreement. The proposal had not been signed by representatives of Carr. At the meeting, Mr. Kilp and Mr. Kramer informed Plaintiff that he had twenty-one days in which to consider the proposal and advised him to consult with his attorney. *See* Def.'s Ex. 11, Kilp Dep. at 32, 33. On May 26, 1993, Plaintiff's counsel sent a letter to Carr's Vice President of Human Resources, Ms. Douras, stating that Plaintiff found the general form and terms of the agreement acceptable, but wished to incorporate a few changes. Pl.'s Ex. C. Neither Plaintiff or his attorney received a response from Defendant.

On June 16, 1993, Defendant sent Plaintiff a facsimile, advising him that he was terminated and that he was not to report to work any further. The facsimile, from Mr. Kilp, provided: "I have been informed that you continue to report to work. I don't understand. We told you unequivocally on May 18, 1993, that your employment would terminate on May 28, 1993. If there is any confusion, let me reiterate. YOUR EMPLOYMENT ENDED MAY 28, 1993. DO NOT REPORT TO WORK ANY FURTHER." Pl.'s Ex. G. Plaintiff was not offered any separation agreement thereafter.

According to Plaintiff, prior to receiving the facsimile, he was never told that he was discharged as of May 28, 1993. Conversely, Defendant contends that Plaintiff was told at the meeting with Mr. Kilp and Mr. Kramer in May of 1993 that he would be terminated as of May 28, 1993, regardless of whether he accepted the proposal. However, Mr. Kilp's testimony is unclear as to whether Plaintiff was actually so informed. *See* Def.'s Ex. 11, Kilp Dep. at 32, 33.

Defendant maintains that Plaintiff's termination was part of an organized RIF that was informally implemented. It is undisputed that there was discussion among Carr's management about the need for cutting costs. Regional management were allegedly given a general directive by Mr. Marr, Ms. Douras, and Mr. Burton to reduce staff to cut costs. However, there was no preset dollar amount of cost reductions to be achieved, at least with regard to the Vermont operations. Pl.'s Ex. Q, Kilp Dep. at 18.

There is an absence of internal documentation regarding the alleged RIF. Members of Carr's management admit that there were no written guidelines as to how to analyze who should be discharged. Pl.'s Ex. L, Marr Dep. at 28; Kilp Dep. at 15. In fact, Mr. Burton, Carr's Chief Financial Officer, who admittedly was involved in overseeing the alleged RIF, stated that he did not have any discussions with the regional managers with regard to how to implement the RIF. Pl.'s Ex. L, Burton Dep. at 12, 20. Responding to a question about how he was instructed to cut costs, Mr. Kilp testified, "I don't recall specific instructions on how to do that. There was discussion about marginal performers that we wanted to take advantage of weeding out where we had performance problems." Kilp Dep. at 11.

In addressing the circumstances surrounding Plaintiff's termination, Mr. Marr, then President of Carr, stated "Mr. Kramer and Mr. Kilp recommended that we terminate Plaintiff in order to meet the cost savings goals for Vermont." Def.'s Ex. 1, Marr Aff. at ¶ 19. Allegedly this recommendation was consistent with the directive from upper management that regional managers should determine where staff reductions needed to be made.

However, Mr. Kramer, who oversaw the Vermont operations, maintains that the decision to terminate Plaintiff came from Mr. Marr or Ms. Douras, over his objections that the Canadian operations, of which Vermont was a part, were extremely busy at that time, that the staff of the Vermont operations was working overtime, and that Plaintiff was an asset to those operations. Pl.'s Ex. M., Kramer Dep. at 13. When asked why Plaintiff was terminated, Mr. Kramer responded, "It was via Steve Marr that I got the impression that it was age. They knew that he was fifty-five-ish; the money factor, you know, they knew what he was making; and the fact that Carr was losing money." *Id.* at 74.

Defendant argues that the termination decision was based in part on a note, dated March 18, 1993, written by Doug McKenny. The note, which was not signed by Plaintiff,

reads as follows: "For various reasons, not the least of which is John V. Carr's fiscal restraints, Ron McKenny and I will entertain proposals for employment termination with the Company." Doug McKenny admits that the note represented his wishes at the time, rather than Plaintiff's. Pl.'s Ex. S at 97. Furthermore, in his letter to Ms. Douras about the proposed separation agreement, Plaintiff's counsel affirmed Plaintiff's surprise at receiving the proposal because he had intended to continue in his employment through age sixty-five. Finally, Mr. Marr, whom Defendant agrees played at least some role in the termination decision, was not aware of this note. Pl.'s Ex. H, Marr Dep. at 38.

Plaintiff was the only employee in the Vermont operations who was discharged. At the time of his discharge, he was in his mid-fifties. He was also the only Emery shareholder who was terminated. Bruce Savage and Stan McKenny had retired before the time period in question, and Doug McKenny remained employed by Carr.

According to Defendant, about thirty-five employees were discharged as part of the putative RIF. However, Defendant never issued a company-wide statement that an RIF was in effect, and the proposal given to Plaintiff on May 18, 1993 did not include a provision indicating that it was being offered as part of an RIF. After Plaintiff's discharge, his duties were redistributed to other staff members in the Vermont operations, who were younger than Plaintiff. Pl.'s Ex. H, Kilp Dep. at 21, Compl. at ¶ 47.

### Discussion

■ Summary judgment shall be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A fact is material when it affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is a genuine dispute over a material fact when the evidence requires a factfinder to resolve the parties'

differing versions of the truth at trial. *Id.* at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). "Uncertainty as to the true state of any material fact defeats the motion." *Gibson v. American Broadcasting Co., Inc.,* 892 F.2d 1128, 1132 (2d Cir.1989).

■ In analyzing the record, the court must view the evidence in the light most generous to the nonmoving party and resolve all ambiguities in its favor. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those parts of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-movant may not rely on conclusory allegations or mere conjecture, but rather must offer specific facts to support a verdict in its favor. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(e). As to any claim, or essential element thereof, for which the nonmoving party bears the burden of proof at trial, the nonmoving party must make a showing sufficient to establish the existence of that claim or element. *Celotex,* 477 U.S. at 322–25, 106 S.Ct. at 2552–54.

Having set forth the standard for assessing the Motion for Summary Judgment, the Court now turns to the merits. The Court shall address the counts in the order in which they are presented in the complaint.

### I. Breach of Contract [2]

■ In Vermont there is a rebuttable presumption that employment for an indefinite period is at will. *Sherman v. Rutland Hosp., Inc.,* 146 Vt. 204, 207, 500 A.2d 230 (1985). The presumption may be overcome by evidence indicating that the employer expressly or by clear implication foreclosed its right to terminate except for cause. *Benoir v. Ethan*

---

**2.** In a diversity action, the court shall apply state law to resolve the dispute. *Erie R.R. Co. v.* *Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

*Allen, Inc.*, 147 Vt. 268, 270, 514 A.2d 716 (1986). The outstanding issue before the Court is whether there is sufficient evidence to suggest that Carr so limited its right to terminate Plaintiff.

■ Plaintiff argues that he could not be terminated by Carr arbitrarily, but rather only for just cause. He points to the oral representations made to him and his fellow shareholders, the sale of the Emery business to Carr and the atmosphere of trust that attended the sale, the duration of his employment, and the policies set forth in the Administration Manual as evidence that his employment with Carr was not at will. In determining whether an employer has modified the employee's at will status, a court may consider a variety of factors, including "the personnel policies or practices of the employer" and "actions or communications by the employer reflecting assurances of continued employment." *Pugh v. See's Candies*, 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917, 925 (1981). *See also Benoir*, 147 Vt. at 270, 514 A.2d 716; *Ploof v. Brooks Drug, Inc.*, No. 89–270, 1991 WL 497170, at *2 (D.Vt. Aug. 28, 1991).

## A. Statute of Frauds

As a preliminary matter, Defendant argues that because Plaintiff alleges "lifetime employment" and does not have a written employment contract, his contract claim is prohibited by the Statute of Frauds. In support of its contention, Defendant relies on *Gaffney v. Johnson Filaments, Inc.*, Chittenden Superior Court, Docket No. S1413–91 CnC (May 5, 1994) (Katz, J.). Having reviewed the applicable statute, 12 V.S.A. § 181(4) (1973 & Supp.1994), and the Vermont Supreme Court's interpretation of it, the Court finds that the contract at issue was capable of being performed within one year and is therefore not barred.

Title 12 V.S.A. § 181 provides, in pertinent part:

An action at law shall not be brought in the following cases unless the promise, contract or agreement upon which such action is brought or some memorandum or note thereof is in writing, signed by the party to be charged therewith or by some person thereunto by him lawfully authorized:

... (4) An agreement not to be performed within one year from the making thereof.

The *Gaffney* court states that "because parties generally do not intend a lifetime term of employment to be completed within one year, an oral promise of such is not enforceable under the statute of frauds." No. S1413–91 CnC, slip op. at 2. The Court declines to follow the holding in *Gaffney* for two reasons.

In reaching its decision, the *Gaffney* court relies on *Hinckley v. Southgate*, 11 Vt. 428 (1839). As this Court reads *Hinckley*, it involved an agreement "for the term of one year from the first day of April, then next." 11 Vt. at 428. Because the agreement clearly could not be performed within one year by its own terms, it was barred by the Statute of Frauds. This is distinguishable from cases in which there is uncertainty as to whether the contract may be performed within the year. *See id.* at 430. *See also Bonfanti v. Ayers*, 134 Vt. 421, 422, 365 A.2d 268 (1976) (where the plaintiff agreed to loan money to defendant for a "long period of time," the statute was no bar. The statute was not invoked despite the fact that the time of the performance was uncertain and could have extended beyond a year.)

■ It is the nature of the undertaking which governs the applicability of the Statute of Frauds and not the capacity to comply. *See, e.g., Frigon v. Whipple*, 134 Vt. 376, 378, 360 A.2d 69 (1976). In *Lawrence v. Stewart*, 109 Vt. 333, 342, 196 A. 750 (1938), the Vermont Supreme Court held the Statute of Frauds inapplicable because the time in which performance was to occur was uncertain. The case involved an oral agreement between a brother and sister, whereby the sister was to care for their mother, and the brother was to pay her for doing so. The court found that the contract was capable of being performed within one year, as either the mother or the sister could have died or otherwise ended the arrangement within that time period. *Id.*

■ Likewise, in the instant matter, although the term of employment was uncertain, it was capable of being performed within one year, inasmuch as Plaintiff could have been discharged for cause, could have retired, or could have passed away during that time. Finding that the Statute is not a bar, the Court turns to Plaintiff's arguments on the breach of contract claim.

## B. *Oral Assurances*

■ First, Plaintiff contends that his employment at will status was modified by statements made by Mr. Marr and Mr. Lowrie to the effect that his employment was secure as long as his job performance remained satisfactory.[3] Vermont courts have repeatedly held that such oral assurances cannot be transformed into binding contract terms. *See Marcoux–Norton v. Kmart Corp.* (D.Vt.1993), 907 F.Supp. 766, 771–72 (forthcoming) (employee's testimony that he was led to believe by management that he would continue to be employed as long as there was work available and as long as he performed satisfactorily amounted to "vague assurances," not rising to the level of negotiated contract terms); *Chandler v. Bombardier Capital, Inc.,* No. 90–64, 1992 WL 474798, at *5 (D.Vt. Oct. 8, 1992) (management's statement to employee that "short of [doing something like stealing from the company], you should feel comfortable that a person, you know, of your background could be assured of long term employment here" was insufficient to create a contract for employment until retirement); *Ploof,* 1991 WL 497170, at

*3 (employee who was promised that "he had a job as long as he wanted it, provided his work performance was satisfactory" could not overcome presumption of at will employment); *Moss v. Mutual of Omaha Ins. Co.,* No. 89–138, 1990 WL 485666, at *3 (D.Vt. April 9, 1990) (employee's at will status was not modified by statements by management that "if he did his job, he'd having nothing to worry about").

The rationale for not interpreting these kind of oral assurances as contractual obligations is twofold. First, there is an awareness that as two parties embark on a new employment relationship, neither expects it to be unsatisfactory. This optimism is often expressed with comments, such as "you can continue in your employment here, as long as you do your job." Reality dictates that such expressions of hope are simply that, and without more, they cannot be held to bind the employer. *See Chandler,* 1992 WL 474798, at *11, fn. 8 (citing *Rowe v. Montgomery Ward & Co., Inc.,* 437 Mich. 627, 640, 473 N.W.2d 268, 273 (1991)). Second, and more importantly, the concept of satisfaction is an elusive one, which must be left to the discretion of the employer. "[T]he concept of satisfaction is too ambiguous to create any substantive employment rights.... Where employment is contingent upon satisfactory performance ... the employer is the sole judge of what is satisfactory." *Satink v. National Life Ins. Co.,* No. S–462–86WnC, slip op. at 5 (Vt.Super. Nov. 3, 1987) (Morse, J.) (cited in *Ploof,* 1991 WL 497170, at *3; *Chandler,* 1992 WL 474798, at *5). In evalu-

---

**3.** Defendant argues that these statements are barred by the integration clause of the Agreement for Sale. In support of its assertion, Defendant cites, *inter alia, Ditzik v. Schaffer Lumber Co.,* 139 Mich.App. 81, 360 N.W.2d 876 (1984), and *Boulevard Bank v. Adams Newspapers,* 787 F.Supp. 122 (E.D.Mich.1992). Having reviewed these cases, the Court concludes that they do not mandate exclusion of the alleged statements of Messrs. Marr and Lowrie. Rather, they express the well-recognized principle that "[w]here a binding agreement is integrated, it supersedes inconsistent terms of prior agreements and previous negotiations to the extent that it is inconsistent with them." *Ditzik,* 139 Mich.App. at 88, 360 N.W.2d 876; *Boulevard Bank,* 787 F.Supp. at 124.

In *Ditzik* and *Boulevard Bank,* the parties were attempting to introduce evidence of an oral agreement that was clearly inconsistent with the terms of the integrated written contract. The instant matter is distinguishable in two respects. First, although the Agreement for Sale may be a fully integrated agreement as to the purchase and sale of the Emery stock, its scope may not include the terms of the Emery shareholders' future employment. Extrinsic evidence such as the letter from Mr. Marr to Stan McKenny addressing employment issues and testimony as to the oral assurances made to the Emery shareholders are admissible to show the scope of the Agreement for Sale. Moreover, the evidence regarding the continued employment of Plaintiff and his fellow shareholders is not inconsistent with the terms of the Agreement for Sale.

ating the statements made to Plaintiff, the Court concludes that the oral assurances alone are insufficient to constitute a contract or to otherwise alter Plaintiff's at will status.[4]

### C. Personnel Manuals

The Court next turns to an analysis of Carr's company policies and personnel manuals. Plaintiff asserts that the Administration Manual creates an implied contract for employment terminable only for just cause. In *Taylor v. National Life Insurance Co.*, 161 Vt. 457, 464, 652 A.2d 466 (1993), the Vermont Supreme Court held that an employer may unilaterally modify an employee's at will status by adopting written company policies that are inconsistent with the at will employment relationship. Personnel manuals setting forth a progressive disciplinary system may be used as evidence that a contract requiring just cause for termination has been created. *Id.* The court adopted the following reasoning:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No preemployment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally.

4. Without citing any Vermont case law to support his proposition, Plaintiff contends that the representations made to Plaintiff were more than "vague assurances," given the context in which they occurred. Even if the Court accepts Plaintiff's argument, the fact remains that the oral representations allegedly were to the effect that Plaintiff would have his job as long as he performed it satisfactorily. That the representations happened within the context of the sale of Plaintiff's business is inapposite. The determination as to whether Plaintiff has performed satisfactorily is within the employer's discretion.

*Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980).

In subsequent cases, the court further developed the law on personnel manual provisions. *See, e.g., Ross v. Times Mirror, Inc.*, ── Vt. ──, ──, 665 A.2d 580, 584 (Vt. 1995) (where there are explicit policies setting forth specific treatment in specific situations, there may be an enforceable contract). The critical inquiry in assessing whether an implied contract exists is whether the employer has created a situation " 'instinct with an obligation.' " *Taylor*, 161 Vt. at 464, 652 A.2d 466 (quoting *Toussaint*, 292 N.W.2d at 892).

Defendant argues that the Manual cannot form the basis for an implied contract for several reasons. First, Plaintiff never received a copy of the Manual and thus, he is not familiar with its provisions. Second, even if Plaintiff were familiar with the Manual, the policies therein do not apply to him. Finally, the Manual is a limited purpose manual intended only to provide guidance to supervisors rather than to create rights in employees. In evaluating these arguments, the Court finds that contested issues of fact are raised, which, if resolved in Plaintiff's favor, could create a binding contract.

 In support of its first argument, Defendant relies on the *Ross* court's statement that "only those policies which are definitive in form, communicated to the employees, and demonstrate an objective manifestation of the employer's intent to bind itself will be enforced."[5] 665 A.2d at 584. According to Defendant, Plaintiff must show that he is at least aware of the personnel policies at issue in order for the Court to conclude that there may be an enforceable contract.[6] Assuming

5. Defendant does not contend that its progressive disciplinary policies are too indefinite so as to fail to meet the standards enunciated in *Ross* nor does the evidence support such a contention.

6. Defendant does not argue that Plaintiff must have received a copy of the Manual for an implied contract to have been created. Moreover, the case law does not mandate such a conclusion. *See Taylor*, 161 Vt. at 465, 652 A.2d 466 (fact that manual was distributed solely to supervisors did not preclude the creation of an implied contract). Rather, it is sufficient that the em-

arguendo that Defendant is correct, the Court finds that statements within the Manual itself provide evidence that the policies were communicated to all employees, including Plaintiff. The Manual states, "[s]upervisors are responsible for implementation of company policies, *which requires communicating and promoting them to your staff and ensuring compliance. See* Pl.'s Ex. V (emphasis added). Based on the reasonable inference that this instruction was in fact carried out, there is a triable issue of fact as to whether the provisions of the Manual were communicated to Plaintiff.

Defendant next contends that the policies within the Manual are not applicable to Plaintiff. However, Plaintiff submits the testimony of Carr's Vice President of Human Resources, Ms. Douras, in which she states that some of the Manual policies are in fact applicable to Plaintiff. *See* Pl.'s Ex. A, Douras Dep., attach. to Paper # 17. Thus, whether Plaintiff was subject to the provisions of the Manual, including the progressive disciplinary system, is a disputed issue of fact.

Finally, Defendant argues that the Manual was meant to provide guidance for supervisory personnel, not to create obligations to employees. It contrasts the company-wide distribution of the Employee Handbook with the limited distribution of the Manual to show that the Manual was not intended to be binding. The fact that there are both an employee handbook, distributed to all employees, and a manual, distributed solely to supervisors, does not preclude creation of an implied contract based on the provisions of the manual. *Taylor,* 161 Vt. at 465–66, 652 A.2d 466.

Moreover, in the case at bar, there is evidence that the purpose of the Manual is to establish uniform and consistent methods of treatment of employees to create an enhanced working relationship. The Manual acknowledges that "[v]ariations in treatment of individuals by different supervisors under the same circumstances is unfair and de-

structive of good personnel relations." The Manual also instructs the supervisory personnel to "ensure compliance" from their employees with these provisions.

The Court recognizes that a limited purpose manual, such as this one, may be insufficient in some circumstances to create contractual rights. *Taylor,* 161 Vt. at 465, 652 A.2d 466. However, where, as here, the employer allegedly set forth policies in the manual in the hopes of eliciting better performance, the Court cannot conclude as a matter of law that there is no contract. *See e.g., Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1088 (1984) (cited with approval in *Ross,* 665 A.2d at 584) (an employee manual should be binding when the principal, though not necessarily exclusive, reason that the employer has created the manual is to create an atmosphere of fair treatment and when the employer expects the employees to abide by such policies); *cf. Triplett v. Electronic Data Systems,* 710 F.Supp. 667, 673–74 (W.D.Mich.1989) (cited with approval in *Taylor,* 161 Vt. at 464, 652 A.2d 466) (a limited purpose manual was held not binding where it was apparent that it was not intended to elicit enhanced performance).

This is especially true in light of the fact that Vermont courts have consistently held that it is for a jury to determine whether a handbook has established contractual rights. *See, Sargent v. Columbia Forest Products, Inc.,* No. 2:93–CV–116, slip op. at 6, 1994 WL 902817 (D.Vt. August, 1994) ("The effect of the *Taylor* decision was to convert the question of whether an employment handbook constitutes a contract from a question of law into a question of fact for the jury."), *rev'd on other grounds,* 75 F.3d 86 (2d Cir.1996); *see also Farnum v. Brattleboro Retreat, Inc.,* — Vt. —, —, 671 A.2d 1249, 1254 (1995) (court held that whether handbooks created an implied contract was a jury question). Hence, the Court finds that the progressive disciplinary system set forth in the Administration Manual may have modified Plaintiff's at will employment status.[7]

ployer intended the policies to be communicated to the employees.

**7.** Defendant contends that if the Court finds an enforceable contract for just cause termination,

summary judgment is still appropriate because the RIF provides just cause for Plaintiff's termination. Defendant urges the Court to accept the result in *Taylor,* whereby the Court held that

## D. Disclaimer

Finally, Defendant contends that the at will disclaimer in the Employee Handbook prohibits the Manual from becoming a binding contract. According to *Ross*, the effectiveness of a disclaimer depends on the circumstances. 665 A.2d at 583. To hold otherwise would allow an employer "to have it both ways—enjoying the morale-enhancing benefits of fair procedures most of the time, but relying on a handbook disclaimer whenever it chose to jettison its procedures in a particular case." *Id.*

■ Whether a disclaimer bars the creation of an implied in fact contract must be assessed in the context of all of the personnel manual provisions and any other circumstances bearing on the employment relationship. *Farnum*, 671 A.2d at 1254. "The mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an employee handbook." *Id.* This Court has recently found that a disclaimer stating that the handbook "is not intended as a contract or agreement for employment" was insufficient to prohibit a finding that the employment relationship had been modified. *Mecier v. Branon*, No. 1:96–CV–17, slip op. at 7, —— F.Supp. ——, —— [1996 WL 293687] (D.Vt. Feb. 20, 1996) (Murtha, C.J.).

■ In the instant matter, the Manual sets forth a specific disciplinary policy that is to be carried out and enforced by Defendant's supervisors. By providing for termination for any reason or no reason at all, the at will disclaimer contradicts the progressive disciplinary system set forth in the Manual. Because of these "mixed messages," whether the Manual creates an implied contract remains a question for the factfinder. *See Farnum*, 671 A.2d at 1254.[8]

In light of the foregoing analysis, the Court finds that there is sufficient evidence for a factfinder to conclude that the Administration Manual has modified Plaintiff's at will status. Defendant's Motion for Summary Judgment on the breach of contract claim is therefore DENIED. The Court now turns to consideration of Plaintiff's promissory estoppel claim.[9]

## II. Promissory Estoppel

■ "Promissory estoppel may modify an at will employment relationship and provide a remedy for wrongful discharge.... [I]t is an independent cause of action, and may be used affirmatively, if the elements are present." *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 571, 613 A.2d 1277 (1992). To survive a motion for summary judgment, Plaintiff must present sufficient evidence on each element of his promissory estoppel claim. Vermont has adopted the Restatement view of promissory estoppel, defining it as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts, § 90(1) (1981); *see also Alpert v. Thomas*, 643 F.Supp. 1406, 1420 (D.Vt.1986).

plaintiff's contract claim ultimately could not survive defendant's motion for a directed verdict because defendant's economic circumstances provided just cause for termination. Unlike the *Taylor* plaintiff, however, Plaintiff here is challenging the contention that Defendant was facing dire economic circumstances at the time he was released from employment. 161 Vt. at 466, 652 A.2d 466. Although economic circumstances may provide just cause for termination, whether such circumstances in fact exist is a question for the jury. See *infra* for a further discussion on the legitimacy of the alleged RIF in the context of the employment discrimination claim.

8. In a recent decision, the Second Circuit upheld a disclaimer and forbid the plaintiff from bringing a wrongful discharge claim. *See Cook v.*

*Arrowsmith Shelburne, Inc.*, 69 F.3d 1235 (2d Cir.1995). However, the disclaimer was distinguishable from that in the case at bar. First, the disclaimer was repeated in both a written offer of employment and a handbook. *Id.* at 1242. Second, the disclaimer did not use boilerplate language. *Id.* Third, there was no allegation that the disclaimer conflicted with any other provision of the handbook. Finally, the Second Circuit Court did not have the benefit of the Vermont Supreme Court's decision in *Farnum* when it made its decision.

9. While the Court recognizes that a promissory estoppel claim may be made on the basis of a personnel manual, the Court will not address this issue, as the parties have not raised it.

Plaintiff points to two "promises" about his future job security on which he allegedly relied. Both involve oral assurances implying that Plaintiff would not be terminated without cause. The first promise is based on the statements made by Mr. Marr and Mr. Lowrie to the effect that Plaintiff would have his job as long as his performance remained satisfactory. The second and related promise also arose from statements made by Mr. Marr and Mr. Lowrie in which they assured Plaintiff that a written contract for just cause employment would not be necessary. Plaintiff's principal argument is that he transferred his stock in Emery to Defendant, based on these representations. He also maintains that he did not insist on a written employment contract because of the second promise.

With regard to the first statement made to Plaintiff, the Court finds that oral assurances of continued employment based on satisfactory job performance are too indefinite to constitute a promise. *See Marcoux–Norton*, 907 F.Supp. at 772–73. To hold otherwise would bind employers by the mere expression of hope for long term employment. A disappointed expectation is not a promise. *Intermar Inc. v. Atlantic Richfield Co.*, 364 F.Supp. 82, 99 (E.D.Pa.1973); *see also* A. Corbin, Corbin on Contracts, § 201, at 223. (1963 & Supp.1994).

However, as the *Taylor* court implicitly recognized, more specific oral assurances may create a promise for which the employer is ultimately bound. 161 Vt. at 472, 652 A.2d 466. *Cf. Brower v. Holmes Transportation, Inc.*, 140 Vt. 114, 117, 435 A.2d 952 (1981), *overruled on other grounds, Soucy v. Soucy Motors Inc.*, 143 Vt. 615, 471 A.2d 224 (1983). A statement that written contracts are not necessary is sufficiently specific as to convey more than a mere expectation. Thus, for purposes of this Motion, Plaintiff has met the first element of promissory estoppel with respect to the second alleged promise.

Next, Plaintiff must show that his reliance on the promise was reasonable. "Promissory estoppel applies to situations where there is no bargain between the parties, only reasonable reliance leading to detriment on the part of one party." *Alpert*, 643 F.Supp. at 1420. The Court finds Plaintiff's reliance on the second promise, that written employment contracts would not be necessary, reasonable in light of the atmosphere of trust and friendship which the parties had in dealing with one another as well as the autonomy with which the Emery operations continued to be run.[10]

Nonetheless, Plaintiff's promissory estoppel claim fails on the element of detrimental reliance. First, Plaintiff is unable to allege a substantial change in position. Plaintiff alleges forbearance in demanding a written employment contract. However, because there is no evidence that Defendant would have agreed to a written contract or that Plaintiff would not have transferred his stock if Defendant refused to provide one, Plaintiff cannot show how he acted to his detriment in this forbearance. *See Overlock v. Central Vermont Public Service Corp.*, 126 Vt. 549, 553, 237 A.2d 356 (1967) (for promissory estoppel to apply, there must be some change of position in the form of actual loss).

Second, the elements of promissory estoppel "specifically require that the promise induce the reliance provided by the promise." *Mecier*, slip op. at 9 (quoting *Stacy v. Merchant's Bank*, 144 Vt. 515, 521, 482 A.2d 61, 65 (1984)). The theory of detrimental reliance applies when the promise comes first and induces the subsequent action in reliance. 1A Corbin on Contracts § 196, at 201; *see also Overlock v. Central Vermont Public Service Corp.*, 126 Vt. 549, 553, 237 A.2d 356 (1967). Here, Plaintiff has presented no evidence that any assurances of just cause employment induced the transfer of stock. Moreover, the transfer of stock is the subject of a separate bargained for agreement. Thus, Defendant's Motion for Summary

**10.** The Court questions whether Plaintiff's reliance continued to be reasonable after the Emery shareholders decided to transfer the remaining stock and the Emery name was discontinued. *See Engstrom v. John Nuveen & Co., Inc.*, 668 F.Supp. 953, 963 (E.D.Pa.1987). However, as the promissory estoppel claim ultimately fails on other grounds, the Court need not address this issue.

Judgment on the promissory estoppel claim is GRANTED.

### III. Age Discrimination in Employment Act

In Count III of his complaint, Plaintiff alleges that Defendant fired Plaintiff in violation of the Age Discrimination in Employment Act ("ADEA"). The Act prohibits an employer from discriminating against any individual between the ages of forty and seventy with respect to his compensation, terms, conditions, or privileges of employment. 29 U.S.C. §§ 623(a), 631(a) (1985). Defendant contends that Plaintiff has failed to exhaust his administrative remedies and thus, he is barred from bringing his federal age discrimination claim.

 Prior to commencing a private cause of action, a claimant must follow certain administrative steps. A claimant's failure to comply with these administrative procedures deprives a court of subject matter jurisdiction. See Mohasco Corp. v. Silver, 447 U.S. 807, 812, 100 S.Ct. 2486, 2490, 65 L.Ed.2d 532 (1980). As a preliminary matter, the claimant must file notice of the charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days after the alleged unlawful practice occurred, or in a deferral state, within 300 days from the date of an alleged violation. 29 U.S.C. §§ 626(d), 633(b). It is well-established that Vermont is a deferral state, and thus, the 300 day time limit applies. Galvin v. State, 598 F.Supp. 144, 147 (D.Vt.1984); Fellows v. Earth Const. Inc., 794 F.Supp. 531, 537 (D.Vt.1992), vacated on other grounds, 805 F.Supp. 223 (D.Vt. 1992).

The latest date on which the alleged unlawful violation could have occurred is June 16, 1993. Plainly, more than three hundred days has since passed, and Plaintiff has not filed the proper notice.[11] Therefore, as to the federal age discrimination claim, Defen-

### IV. Vermont Fair Employment Practices Act

Plaintiff also alleges that Defendant has violated state age discrimination law. The Vermont Fair Employment Practices Act ("FEPA") provides, in relevant part: "It shall be an unlawful employment practice ... [f]or any employer ... to discriminate against any individual because of ... age." 21 V.S.A. § 495(a)(1) (1987 & Supp.1994). Defendant contends that age played no role in its decision to terminate Plaintiff, rather Plaintiff was terminated because of an RIF.

With regard to employment discrimination claims, "[t]he standards and burdens of proof under state law are identical to those existing under federal law." Cobb v. Dufresne–Henry, Inc., 603 F.Supp. 1048, 1053 (D.Vt.1985). The Vermont Supreme Court has consistently held that FEPA is patterned on Title VII. See, e.g., Hodgdon v. Mt. Mansfield Co., Inc., 160 Vt. 150, 161, 624 A.2d 1122 (1992). The standards established under the ADEA also may provide useful analytical guidance. Ross, 665 A.2d at 586.

 In 1989, the United States Supreme Court set out what is known as the Price Waterhouse framework or the "mixed motives" analysis. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). This framework applies when there are allegedly both discriminatory and non-discriminatory reasons for the employer's decision. First, a plaintiff must establish that a prohibited factor played a motivating part in the termination decision. Hodgdon v. Mt. Mansfield Co., Inc., 160 Vt. at 161, 624 A.2d 1122.[12] The defendant then bears the burden of showing that it would have made the same decision even if it had

---

11. The Court notes that Plaintiff does not refute Defendant's argument on this issue in its Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Paper # 31).

12. As discussed infra, Defendant asks the Court to employ the McDonnell Douglas framework. The Court does not do so for the following rea-

son. "[O]nce the plaintiff has shown that an illegal, discriminatory motive was a factor in the employer's decision, the reason for applying the McDonnell Douglas formula—to uncover the motives involved in the employment decision—no longer exists." Graff v. Eaton, 157 Vt. 321, 324, 598 A.2d 1383 (1991).

not allowed the prohibited factor to play such a role. *Id.*[13]

As long as the plaintiff submits sufficient evidence to make a preliminary showing of discriminatory motive, it is for the jury to determine whether the plaintiff has established that the prohibited factor was in fact a motivating consideration. *Id.* at 161–62, 624 A.2d 1122. The Court finds that Plaintiff has made this preliminary showing for purposes of the instant Motion.

In support of his contention that age illegally played a role in his termination, Plaintiff has submitted the deposition testimony of Mr. Kramer, who at the time in question was the Vice President of Canadian Operations, including the Vermont facility. Responding to a question about why Plaintiff was terminated, Mr. Kramer states, in part, "It was via Steve Marr that I got the impression that it was age." Based on this statement, a reasonable factfinder could determine that age was a motivating factor in the decision to terminate Plaintiff.

Defendant argues that even if Plaintiff can show that age was a motivating factor, summary judgment remains appropriate. Pointing to its overall need to cut costs and the consequent RIF, Defendant contends that it has conclusively shown that it would have terminated Plaintiff irrespective of any inappropriate considerations. The Court disagrees. Plaintiff has raised substantial questions about the existence of the RIF. Most importantly, Plaintiff has shown the complete absence of formal guidelines or written instructions in the implementation thereof.

Thus, the Court finds that there are disputed issues of fact as to whether an RIF was actually in effect.

Alternatively, Defendant contests the sufficiency of Plaintiff's direct evidence of discriminatory motive, and thus, it urges the Court to apply the *McDonnell Douglas* burden shifting analysis in evaluating Plaintiff's claim.[14] Even if the Court were to use this analysis, however, it would reach the same result.

To prevail under this framework, Plaintiff must first establish a prima facie case of age discrimination. This requires a four part showing: 1) plaintiff was in a protected age category; 2) plaintiff was qualified for the job; 3) plaintiff was discharged; and 4) the discharge occurred under circumstances which give rise to an inference of age discrimination.[15] *Moss,* 1990 WL 485666, at *2; *see also Ross,* 665 A.2d at 586–87. Upon this showing, the burden of production shifts to the defendant to show that some legitimate, non-discriminatory reason existed for the allegedly unlawful employment decision. *Ross,* 665 A.2d at 586–87. Assuming the defendant articulates a legitimate, non-discriminatory reason for its conduct, the plaintiff then has the opportunity to show that the defendant's stated reason is mere pretext. *Id.*

First, the Court finds that Plaintiff has established a prima facie case. Plaintiff was in his mid-fifties at the time of his discharge, he was indisputably qualified for the job, he was the oldest Vermont employee and the only one discharged at a time when the employees of the Vermont operations were ad-

---

13. The Court notes that in 1991 Congress amended Title VII with respect to the burden of proof on mixed motives claims. Title VII now provides: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that [a prohibited factor] was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m) (1994 & Supp. 1995).

14. In 1973, the United States Supreme Court set forth a framework for evaluating employment discrimination cases when plaintiff's evidence of disparate treatment is circumstantial. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

15. According to Defendant, the fourth element that Plaintiff must prove is that he was replaced by a younger employee who was assigned to do the same work. Defendant contends that Plaintiff cannot show this element because he was not replaced. In *Montana v. First Federal Savings and Loan Assoc. of Rochester,* 869 F.2d 100 (2d Cir.1989), the Second Circuit specifically recognized a different standard for establishing the fourth element in an alleged reduction-in-force case. The Second Circuit held that a discharged employee need only show that the discharge occurred in circumstances giving rise to an inference of age discrimination. *Id.* at 105.

mittedly overtaxed.[16] In addition, Plaintiff work's was redistributed to younger employees.[17]

Moreover, Plaintiff has raised a triable issue of fact as to whether Defendant's articulated reason is pretext by questioning the validity of the RIF. As discussed *supra,* Plaintiff has submitted evidence that there was no need to cut costs in the Vermont operations. He has also shown the lack of information among Defendant's own management about the specifics of the alleged RIF. In fact, the only criterion for selecting employees to be discharged as part of the "RIF" was "weeding out marginal performers." There is an abundance of evidence that Plaintiff was not a marginal performer, but rather was "an asset to the Vermont operations."

While the Court recognizes that it must respect an employer's business judgment, it is not prohibited from looking behind the employer's claim to distinguish between a "poor business decision and a reason manufactured to avoid liability." *Donaldson v. Merrill Lynch,* 794 F.Supp. 498, 506 (S.D.N.Y.1992). For the reasons set forth above, the Court finds that Plaintiff has presented sufficient evidence to create an inference of age discrimination. Therefore, Defendant's Motion for Summary Judgment as it pertains to the FEPA claim is DENIED.

## V. Damages

In his complaint, Plaintiff seeks relief for his unlawful termination in the form of front pay, back pay, emotional distress damages and punitive damages. The Court shall consider each claim *seriatim.*

### A. Front Pay

■ Plaintiff requests front pay as a remedy for his future lost earnings. The enforcement provision of FEPA provides:

(b) Any person aggrieved by a violation of the provisions of this subchapter may bring an action ... seeking damages or equitable relief, including restraint of prohibited acts, restitution of wages or other benefits, reinstatement, costs, reasonable attorneys' fees and other appropriate relief.

21 V.S.A. § 495b(b). Defendant asks this Court to conclude, as a matter of law, that front pay is not available because Plaintiff did not specifically request reinstatement nor show that reinstatement is not feasible. Assuming arguendo that front pay is unavailable unless reinstatement is impossible for purposes of deciding the instant matter,[18] the Court finds that Plaintiff has submitted evidence sufficient to show the infeasibility of reinstatement.

As stated previously, the Court may look to federal law for guidance in analyzing employment discrimination claims. The United States Court of Appeals for the Second Circuit has held that when there is demonstrated animosity between the former employee and the employer, reinstatement may be impossible. *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984). Contrary to Defendant's characterization, Plaintiff has not simply eschewed all interest in reinstatement. Rather, as Plaintiff's deposition testimony indicates, there is animosity on both his part and Defendant's, making reinstatement infeasible. *See* Def.'s Ex. 7, R. McKenny Dep. at 46.

Because Plaintiff has shown that reinstatement is infeasible, his front pay claim is not barred. Thus, Defendant's Motion for Summary Judgment is DENIED with regard to Plaintiff's request for front pay.

### B. Back Pay

■ Defendant also claims that Plaintiff failed to properly mitigate his damages.

16. Of course, Mr. Kramer's testimony that Plaintiff was discharged "because of his age" is still relevant under this analysis.

17. Again, Defendant argues that Plaintiff must show that he was replaced by a younger employee assigned to do the same work. Because Plaintiff was not replaced, his claim must fail. In addition to its comments, *supra* at footnote 15,

the Court notes that reassignment of a discharged employee's work has been found sufficient to meet the "replacement" requirement. *See Nordquist v. Uddeholm Corp.,* 615 F.Supp. 1191, 1196–97 (D.Conn.1985).

18. The Vermont Supreme Court has not addressed the issue of whether a claimant must request reinstatement to be entitled to front pay.

According to Defendant, Plaintiff did not take reasonable steps to find alternative employment between June of 1993 and March of 1994. Consequently, he is not entitled to back pay for that time period. A court awards back pay to make the employee whole. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). An unlawfully discharged employee is generally entitled to back pay from the date of the unlawful termination to the judgment date. *Dunlap–McCuller v. The Riese Organization,* 980 F.2d 153, 159 (2d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993).

■ Although it is well-settled that an individual who has been wrongfully terminated must make reasonable efforts to seek alternative employment, the burden is on the employer to demonstrate that the employee failed to mitigate his damages. *See Ploof,* at *4; *Cartin v. Continental Homes,* 134 Vt. 362, 367, 360 A.2d 96, 100 (1976). As part of bearing this burden, the employer must present evidence not only that the employee did not make reasonable efforts to obtain employment, but also that suitable work existed. *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). To sustain its burden, the employer must present concrete evidence; mere speculation is not sufficient. *See Cartin,* 134 Vt. at 367, 360 A.2d 96.

■ In the case at bar, Defendant has not conclusively shown that suitable work was available during the time period in question. Suitable employment is employment comparable to Plaintiff's former position. *See Clarke,* 960 F.2d at 1152 ("The claimant need not accept employment that is not comparable to his previous position.") Defendant's evidence that the customs brokerage house of Norman G. Jensen requested the use of Plaintiff's license for $1000 per month does not demonstrate comparable employment. Moreover, it is undisputed that Plaintiff conducted a job search after March, 1994, and the only employment he was offered paid an hourly wage of $5.77, and was not substantially similar to the position he had occupied with Defendant. Pl.'s Ex. P, R. McKen-

ny Dep., at 222–229. Based on this evidence, there is a genuine issue of fact as to whether suitable employment was in fact available. Accordingly, Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff's back pay claim.

## C. Emotional Distress

In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiff withdraws his claim for emotional distress damages. Hence, Defendant's Motion for Summary Judgment on this claim is DENIED as MOOT.

## D. Punitive Damages

■ Lastly, Defendant argues that Plaintiff has failed to present evidence of malice, and thus, his claim for punitive damages should be dismissed. To recover punitive damages, a plaintiff must show actual malice on the part of the defendant. *Coty v. Ramsey Assoc., Inc.,* 149 Vt. 451, 464, 546 A.2d 196, *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2903, 101 L.Ed.2d 936 (1988). However, direct evidence of the defendant's mental state is not required. *Id.* Instead, a plaintiff may show malice through "conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression." *Id.* (quoting *Shortle v. Central Vermont Public Service Corp.,* 137 Vt. 32, 33, 399 A.2d 517 (1979)).

■ In the instant matter, Plaintiff has submitted evidence indicating that the first time he learned of his discharge was on the date thereof, by means of a facsimile, stating "YOUR EMPLOYMENT ENDED MAY 28, 1993. DO NOT REPORT TO WORK ANY FURTHER." Accepting Plaintiff's allegations as true, the Court finds that this is sufficient evidence to allow Plaintiff to proceed with his punitive damages claim at this stage of the proceedings. *See Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 297, 576 A.2d 441 (1990) (the court considered the oppressive nature of the plaintiff's discharge in upholding the jury's award of punitive damages, including the fact that he was summarily terminated in a directive to "clean out his desk"). Thus, Defendant's Motion for

Summary Judgment on the issue of punitive damages is DENIED.

## Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment is hereby GRANTED in PART and DENIED in PART. The Motion is GRANTED as to the promissory estoppel and the ADEA claims. The Motion is DENIED on the breach of contract claim, the FEPA violation, and the front pay, back pay, and punitive damages claims. The Motion is DENIED as MOOT with respect to the emotional distress claim.